## MINNIE SCHMIDT v. GEORGE H. HURD REALTY COMPANY AND ANOTHER.[1]

February 25, 1927.

No. 25,764.

**Directed verdict for defendants sustained.**

Plaintiff's decedent entered a room which was being fitted up as a restaurant but which had not been opened to serve meals. He learned that fact both from the appearance of the room and from an answer made to his inquiry as to when meals would be served. On leaving the premises he went to a portion of the room which had been partitioned off and contained an elevator shaft, a storeroom and toilet facilities. In some way he fell into the elevator shaft and was fatally injured. *Held* that, if he was an invitee in the first instance, he became a mere licensee when he went into the passageway leading to the elevator and toilet rooms, that the defendants were under no duty to advise him of the presence of the elevator shaft or of the fact that the door leading to the elevator was not fastened, and that the trial court correctly directed a verdict in defendants' favor for that reason.

Negligence, 29 Cyc. p. 450 n. 70; p. 452 n. 81; p. 458 n. 32, 37, 38.

See notes in L. R. A. 1916F, 280; 20 R. C. L. 68; 4 R. C. L. Supp. 1333; 5 R. C. L. Supp. 1078; 6 R. C. L. Supp. 1180.

Plaintiff appealed from an order of the district court for Ramsey county, Bechhoefer, J., denying her motion for a new trial. Affirmed.

*Harvey O. Sargeant,* for appellant.

*Campbell & Burness* and *Palmer Benson,* for respondents.

LEES, C.

In an action to recover damages for death by wrongful act, the court directed a verdict for the defendants. Plaintiff has appealed from an order denying her motion for a new trial.

The complaint alleged and the proof showed that the defendant realty company was the lessee of a building in the city of St. Paul,

[1]Reported in 212 N .W. 903.

located at 388 Jackson street; that the defendant Adams was a sublessee of the realty company, in possession of the property on September 30, 1925, and about to open a restaurant on the first floor of the building.

The complaint alleged in effect that on September 30, at Adams' invitation, the decedent Louis Schmidt entered the building for the purpose of obtaining a meal; that he was informed that meals would not be served until the following day; that thereupon he went into a passageway leading to a portion of the first floor which had been partitioned off to inclose an elevator shaft, two toilet rooms and a small storeroom; that it was his purpose to use one of the toilet rooms; that by mistake he stepped through the doorway in the elevator shaft and fell to the bottom of the shaft and was fatally injured. Negligence was charged on the ground that defendants had failed to fasten the doorway leading into the elevator shaft and had failed to distinguish that doorway from the others opening from the passageway.

The answer alleged that at the time in question the restaurant had not been opened for public patronage, denied that defendants were negligent and alleged that Schmidt's death was caused by his own want of care.

The evidence showed that Schmidt and Adams had been acquaintances for some months; that Adams had formerly conducted a restaurant on Rice street which Schmidt patronized; that the premises on Jackson street had been occupied as a restaurant prior to the time when Adams took possession; that on the windows in the front these words had been placed by the former tenant: "Business Lunch. Try our Noon-Day Lunch;" that the front door was unlocked; that Adams had not yet opened the restaurant for business; that a plumber was at work in the kitchen at the rear of the front room; that the tables, chairs, lunch counter and other furniture had not yet been put in place; that the floor was littered and dirty. In short it appeared that anyone entering the room would discover at a glance that meals were not being served and that the restaurant had not yet been opened for patronage by the public. The evidence

also showed that Schmidt walked through the front room to the kitchen and inquired when the place would be open for business, and was told that it would not be opened until the following day or the day after, whereupon he buttoned up his overcoat and turned away, saying: "Well, I'll see you again." This was at about 11 o'clock in the forenoon. Schmidt was never again seen alive.

Upon the door leading from the main room to the rear portion partitioned off as above described, the word "Toilet" was printed in conspicuous letters. On passing through this door, the elevator shaft would be first encountered and beyond it the two toilet rooms. An electric light bulb was suspended from the ceiling of the passageway. It was lighted on the day in question. There was no other light. The opening into the elevator shaft had double doors. One was bolted; the other was not. The elevator was operated by hand. It could be raised by pulling on one rope and lowered by pulling on another. At the first floor level there was a hatchway having an automatic door attached to the rear wall of the shaft. When the elevator was raised six or seven feet above the floor level, the door closed automatically. When it was closed, it was impossible for a person to fall down the shaft. The elevator was so constructed that it could not be lowered below the level of the first floor.

The evidence is in some conflict as to the position of the elevator on October 9, when Schmidt's lifeless body was discovered at the bottom of the shaft. Some of the witnesses testified that the elevator was then at the second floor level; others that it was at the first floor level. The city inspector of elevators testified that the automatic door to the hatchway and the elevator were both in good working order.

The trial court was of the opinion that the evidence warranted the inference that Schmidt came upon the premises intending to get his noonday lunch if the restaurant was open for business; that from the appearance of the room he must have known, as soon as he entered, that meals were not being served; that he went to the kitchen merely to ascertain when the restaurant would be open;

that, when his inquiry was answered, his actions indicated that he was about to go out by the way in which he had come in; that he received no invitation or permission to use the toilet rooms; that, if he went to the portion of the building where they were located, he had no greater rights than a bare licensee; that Adams was under no duty to warn him of the danger of falling into the elevator shaft; and that the case was ruled by Mazey v. Loveland, 133 Minn. 210, 158 N. W. 44, L. R. A. 1916F, 279.

In that case, plaintiff had gone to the defendant's house in the evening to ascertain the cost of certain floral decorations she wished to have placed in her home. She was driven to the house by her husband. She walked to the door and, while she was talking with defendant, her husband drove his automobile around the street corner and stopped. There was no passageway from the house to the place where the automobile was stopped. Instead of returning by the usual and proper route, plaintiff cut across the lawn and tripped upon a wire supported by gas pipes which defendant had placed to keep persons from crossing the lawn. In her complaint she alleged that the defendant observed her movements, knew of the presence of the wire, and was under a legal duty to warn her of the danger of coming in contact therewith, but negligently failed to do so. The trial court dismissed the action and this court sustained the ruling, saying in substance that plaintiff was at defendant's house at his invitation but, when she elected in taking her departure to cross the lawn instead of passing down the walk leading to the street, she became a mere licensee in thus leaving the premises and, even though defendant observed her in the act of crossing the lawn, he was under no duty to advise her of the presence of the wire.

The principles by which the courts are guided are well stated in Menteer v. Scalzo Fruit Co. 240 Mo. 177, 144 S. W. 833, substantially as follows: The proprietor of a place of business must use ordinary care to keep the premises to which he expressly or impliedly invites customers in such condition as to prevent injury to them. The duty is coextensive as to time and place with the invitation extended. When an invitee steps beyond the bounds of his

invitation he becomes a mere licensee and must take as he finds it the part of the premises he then enters. He may complain of wanton or intentional injury, but not that the place into which he goes for his own purpose and without invitation was not made safe in anticipation of his unexpected and undesired presence. They are also clearly stated in 20 R. C. L. p. 68 as follows:

"If a person, although on the premises by invitation, deviates from the accustomed way or goes to a place other than such as are covered by the invitation, the owner's duty of care ceases forthwith. * * * It is settled that a person lawfuly upon the premises of another is bound to leave them by the usual, ordinary, and customary way in which such premises are and have been departed from; and if, for his own convenience, or some other reason, he departs from such way, and takes another, he becomes, at best, a mere licensee, and cannot recover for injuries from a defect in the latter way."

We conclude that the trial court rightly directed a verdict in defendants' favor.

Order affirmed.