JAMES C. VAN AVERY, APPELLEE, v. PLATTE VALLEY LAND & INVESTMENT COMPANY, APPELLANT.

275 N. W. 288

FILED OCTOBER 1, 1937. No. 30026.

*Brogan, Ellick, Shoemaker & Fitzgerald* and *Robert B. Hamer,* for appellant.

*Wear, Boland & Nye, contra.*

Heard before GOOD, EBERLY, DAY and CARTER, JJ., and HASTINGS and RINE, District Judges.

PER CURIAM.

This is an action at law to recover for personal injuries sustained by plaintiff, Van Avery, on March 1, 1935, as the result of falling into a "pit" or "stairway" located in the interior of a building owned by defendant for some eight or nine years, and, by a lease in writing, leased to one Herman Monico, who then was, and for more than two years prior had been, in exclusive possession thereof. Plaintiff made the defendant landlord the sole defendant. The building leased was occupied by the tenant as a public garage, primarily for the day storage of automobiles. A trial of the issues involved to a jury resulted in a verdict and judgment for plaintiff, and, from the order of the trial court overruling its motion for a new trial, the defendant appeals.

The record establishes the following:

Plaintiff called at the garage conducted by Herman Monico on the 1st day of March, 1935, about 4:30 p. m. This is a brick building situated at the southwest corner of the intersection of Seventeenth and Jackson streets in the city of Omaha, Nebraska, and is constructed on the north 80 feet of lots 1 and 2, in block 5, of Kountze & Ruth Addition to Omaha. The large entrance for receiving automobiles is in the north wall. The building, the evidence indicates, extends east to west. A brick partition wall extending from the north to the south wall divided the building into two rooms, at least, the exact dimensions of which are not disclosed by the record, but the larger of which,

extending eastward from this partition to the west wall of the building, constituted the garage proper. The evidence discloses no openings admitting light in the west wall. Some ten feet east of the southwest corner of the room a brick partition connecting with, and built at right angles with, the south wall of the garage, extending from floor to ceiling of the room, projects into it for a distance of some ten or twelve feet. The floor is composed of cinders. Resting on its edge on the floor, extending from the base of the projecting wall west to the west wall, at the time of the accident, a 2 by 12 plank was fastened. The irregularities of the floor at this point were such that the distance from the top of the black cinder floor to the top of this plank as it was in place varied from about four inches to nine or ten inches. The three walls were on the west, south and east sides of what is referred to in the evidence as the "pit," which in fact was the open flight of stairs leading to the engine room containing the heating plant of the building. The plank furnished the protection on the fourth side. The evidence is without contradiction that the space within the garage along the west wall immediately northward was wholly devoted to the storage of automobiles. Here the automobiles were ordinarily backed to the west wall and, parallel to each other, extended eastward into the garage. North of and immediately adjacent to this plank was the stall or place in which the automobile of witness Ralph C. Phelps had been regularly since 1933 daily placed and kept. This automobile when in its usual and proper position stood with its rear close to the west wall and its front extending just beyond the projecting brick wall already mentioned. In this situation it formed, together with the other three brick walls, a practical barrier to the so-called "pit" or "stairway." In the three walls last mentioned as constituting the surroundings on three sides of the stairway, there were no windows or openings for the admission of light to the space thus inclosed. While electric fixtures were provided for lighting this part of the premises, they were not lighted at the time of the accident, and the exact situa-

tion of the cars at that moment, in the southwest corner of the garage and along the west wall thereof, is a matter of disputed evidence. The inclosing wall and absence of artificial lights created within the space thus inclosed, according to plaintiff's evidence, such a pall of darkness in the southwest corner of the garage, especially in the space included within the surrounding walls referred to, that said "pit" was dark, obscured and concealed. But it must be admitted that there was nothing to indicate that this portion of the garage was devoted to any purpose whatever save for the placing and storage of automobiles. Immediately east of the east wall inclosing the pit was a space illuminated by a window or opening in the south wall of the garage.

After entering the large north door of the garage, plaintiff proceeded at once to the "office." This office was a construction about six foot square, with windows on two sides and a door, supplied with a desk, chairs, and stove for heat, located about the center of the garage and devoted to the purpose its name implies. Herman Monico, Sr., the proprietor of the garage, was absent, but Herman Monico, Jr., a youth of 17 and a son of the proprietor, "who worked in the garage," was sitting therein. Without in any manner announcing the purpose of his visit, plaintiff inquired of young Monico where his father, Herman, was. The son replied, "He is out in the back room," and at the same time pointed toward the west wall of the garage and in the general direction of the north door in the west wall, which was the only door in sight in that wall from the position that young man then occupied. This door was located from 75 to 100 feet from the front of the building. Plaintiff testifies that on receiving this information, without in any manner announcing his business or purpose, he left the little office and walked straight west "to the large door" in the west wall, or the door covered with canvas, "pushed the canvas to one side and called 'Herman' " and "tried to get hold of Herman." Looking into the dark southwest corner of the building, the plaintiff discovered a closed door in

the west wall near its junction with the south wall of the garage. He turned southward and walked toward it. Plaintiff testifies that he did not look down as he passed along; that he did not see the 2 by 12 plank that constituted a part of the north barrier to the pit; that "his head was about even with his vision," and he looked straight out. He first testified that he knew of no cars at this time parked along the west side of the garage. His attention was then called to his deposition previously taken, covering the facts relating to the accident in suit, in which the following question was propounded: "Were there many cars parked on the main floor of the garage at the time you first went into the office to talk to the boy?" To which he had replied, "There were several that were parked on the west side." His memory being thus refreshed, he then replied, "Yes, I would say several were." But plaintiff is unable to locate these cars in their relative positions along the west wall. He testifies further, however, that when getting no response to his call for "Herman" through the door from which he had removed the canvas, he "decided he must be in another room," and that the closed door in the extreme southwest corner he had seen was the door leading to a back room, and he walked toward it, and the next thing he knew he was tumbling into space. Herman Monico, Jr., from his position at the office, was the only other eyewitness to the accident. That young man testifies that at the time of the accident four automobiles were backed up to the west wall of the garage, extending to the eastward; that the Phelps car was in place immediately north of the "pit;" that Mr. Frost's car was standing immediately north of the Phelps car in its proper position; that then came an open space of a few feet, being a passageway leading to the canvas-covered door in the west wall. Immediately north of the narrow open space two more automobiles were standing parallel with the two already described. He further testifies that, after plaintiff called three times for Herman Monico, he walked first east and then south; that he stepped on the bumper of the Phelps car, then on the

fender, and "into the pit he went." Plaintiff denies this, and swears no automobile was standing immediately in front of the pit at the time he walked into it. Nevertheless, the evidence may be said to be almost uncontradicted that, in order to remove the plaintiff from where he had fallen to the garage office, an automobile was driven 30 feet eastward to make a passageway. For the purpose of this opinion, plaintiff's version on this point that he did not come into personal contact with the automobile before falling into the pit will be accepted as correct.

The gist of the present action is the alleged negligence of the defendant landlord in permitting the "pit" or "stairway," constituting the sole means of access to the heating plant of the garage leased by it as landlord, to remain unguarded and unbarricaded on the north side thereof, thereby constituting a dangerous condition resulting in injuries to plaintiff, then and there an invitee.

In this connection, it is suggested that the normal conception of negligence is the doing of an act in a manner which creates an unreasonable danger of invading the legally protected interests of another person or group of persons. It is only in the exceptional situation that the failure to act subjects one to liability. Bohlen, Studies in the Law of Torts (1926) 33, 38-65.

Preliminary to the consideration of the determinative issues presented in the record before us, it may be noted that the validity of the lease of real estate here involved, and the *bona fides* of the relation of landlord and tenant created thereby, are in no manner affected by the provisions thereof determining that the amount of the rental shall be fixed at a definite percentage of the amount of income received by the tenant from the garage business carried on by him in the premises demised. 16 R. C. L. 578, sec. 53; 35 C. J. 955; *Z. C. Miles Co. v. Gordon*, 8 Wash. 442, 36 Pac. 265; *State v. Superior Court*, 108 Wash. 443, 184 Pac. 348; *Gottlieb Bros. v. Culbertson's*, 152 Wash. 205, 277 Pac. 447; *Ault Woodenware Co. v. Baker*, 26 Ind. App. 374, 58 N. E. 265; *Norton v. Wiswall*, 26 Barb. (N.

Y.) 618; *Milton-Alvin Holding Co., Inc., v. Williams,* 102 Misc. Rep. 117, 168 N. Y. Supp. 171; *Tomlinson v. Dille,* 147 Md. 161, 127 Atl. 746; *Hansen v. Hansen,* 88 Neb. 517, 129 N. W. 982.

Turning to the real merits of this appeal, it may be said that in this jurisdiction we have long been committed to these views, viz.:

"The rule of *caveat emptor* applies to leases of real estate, wherein the control passes to the lessee, and, in the absence of fraud, deceit or concealment, the duty devolves upon the lessee to examine the premises. with respect to suitability for his business and with respect to safety." *Lowe v. Payne,* 107 Neb. 378, 186 N. W. 320.

And, also, "In the absence of fraud, deceit or concealment, a lessor is not liable in damages to the lessee for defects in a building which are plainly discernible, when liability therefor is not reserved in the lease." *Lowe v. Payne, supra.*

See, also, *Davis v. Manning,* 98 Neb. 707, 154 N. W. 239; *Roberts v. Rogers,* 129 Neb. 298, 261 N. W. 354.

It would seem axiomatic that a tenant would be incapable of conferring, either by contract or by delictum, a greater right than he himself possesses. It is therefore unquestionably the rule generally that guests and invitees of the tenant derive their right to enter upon the premises leased, through the tenant, and have the same but no greater right to proceed against the landlord for personal injuries resulting from alleged defects on the premises than the tenant has. 36 C. J. 204; 16 R. C. L. 1067, sec. 588; *Mackey v. Lonergan,* 221 Mass. 296, 108 N. E. 1062; *Harpel v. Fall,* 63 Minn. 520, 65 N. W. 913; *Towne v. Thompson,* 68 N. H. 317, 44 Atl. 492; *Meade v. Montrose,* 173 Mo. App. 722, 160 S. W. 11; *Bender v. Weber,* 250 Mo. 551, 157 S. W. 570; *Fraser v. Kruger,* 298 Fed. 693; *Land v. Fitzgerald,* 68 N. J. Law, 28, 52 Atl. 229; *Goodman v. Town of Provincetown,* 283 Mass. 457, 186 N. E. 625; *Garland v. Stetson,* 197 N. E. (Mass.) 679; *Kinney v. Luebkeman,* 214 Wis. 1, 252 N. W. 282; *Hogan v. Metropolitan*

*Bldg. Co.,* 120 Wash. 82, 206 Pac. 959; *Bolden v. Independent Order of Odd Fellows,* 133 Wash. 293, 233 Pac. 273; *Mahnken v. Gillespie,* 329 Mo. 51, 43 S. W. (2d) 797; *Cullings v. Goetz,* 256 N. Y. 287, 176 N. E. 397; *Jackson v. Amador,* 75 S. W. (2d) (Tex. Civ. App.) 892.

The plaintiff, however, conceding the existence of the general rules governing the relation of landlord and tenant already referred to, contends that the facts of the present record bring the case well within the scope of two rules relating to this subject, which are in the nature of exceptions to the principles sustained by the authorities heretofore cited, viz.: (1) A rule imposing a tort liability upon a lessor who, knowing the dangerous condition of the premises demised by him, leases the same for a public purpose; and (2) a rule imposing a tort liability in cases of this kind for breach of covenant to repair the demised premises, on part of the lessor.

While appellee's brief contains a wealth of authority, he cites no Nebraska cases sustaining these contentions, and we are unable to find any definite pronouncement of this court on the exact questions here presented for decision.

Taking up appellee's contentions in the adverse order of statement, we find the authorities outside of this jurisdiction are divided as to the imposition of a tort liability upon a landlord for breach of his covenant to repair.

In the leading case of *Cullings v. Goetz,* 256 N. Y. 287, 176 N. E. 397 (a garage case where this question was raised) Cardozo, C. J., said, in part:

"The subject has divided juridical opinion. Generally, however, in this country as in England, a covenant to repair does not impose upon the lessor a liability in tort at the suit of the lessee or of others lawfully on the land in the right of the lessee (see e. g., *Tuttle v. Gilbert Mfg. Co.,* 145 Mass. 169; *Miles v. Janvrin,* 196 Mass. 431; *Fiorntino v. Mason,* 233 Mass. 451, 454; *Carroll v. Intercolonial Club,* 243 Mass. 380, 383; *Dustin v. Curtis,* 74 N. H. 266; *Davis v. Smith,* 26 R. I. 129; *Brady v. Klein,* 133 Mich. 422; *Cavalier v. Pope* (1905) 2 K. B. 757, 762, 764; *Cavalier v. Pope*

(1906) A. C. 428, 433; *Cameron v. Young* (1908) A. C. 176; and see, also, 8 A. L. R. 766, collating the decisions). There are decisions to the contrary (*Flood v. Pabst Brewing Co.*, 158 Wis. 626; *Merchants' Cotton Press & Storage Co. v. Miller*, 135 Tenn. 187; *Barron v. Liedloff*, 95 Minn. 474) but they speak the voice of a minority. Liability in tort is an incident to occupation or control (American Law Inst., Restatement of the Law of Torts, sec. 227). By preponderant opinion, occupation and control are not reserved through an agreement that the landlord will repair (*Cavalier v. Pope* (1906) A. C. at 433; Pollock, Torts (13th ed.) 532; Salmond, Torts (7th ed.) 477). The tenant and no one else may keep visitors away till the danger is abated, or adapt the warning to the need. The landlord has at most a privilege to enter for the doing of the work, and at times not even that if the occupant protests. 'The power of control necessary to raise the duty * * * implies something more than the right or liability to repair the premises. It implies the power and the right to admit people to the premises and to exclude people from them' (*Cavalier v. Pope* (1906) A. C. 433). In saying this we assume the possibility of so phrasing and enlarging the rights of the lessor that occupation and control will be shared with the lessee. There are decisions in Massachusetts that draw a distinction between a covenant merely to repair and one to maintain in safe condition with supervision adequate to the end to be achieved (*Miles v. Janvrin, supra; Fiorntino v. Mason, supra; Carroll v. Intercolonial Club, supra;* see, also, *Robinson v. Heil*, 128 Md. 645; *Collison v. Curtner*, 141 Ark. 122). In the case now at hand, the promise, if there was any, was to act at the request of the lessee. What resulted was not a reservation by an owner of one of the privileges of ownership. It was the assumption of a burden for the benefit of the occupant with consequences the same as if there had been a promise to repair by a plumber or a carpenter (cf. *Zurich Gen. Acc. & L. Ins. Co., Ltd., v. Watson Elevator Co.*, 253 N. Y. 404, 409; *Mollino v. Ogden & Clarkson Corp.*, 243 N. Y. 450).

"The rule in this state is settled in accord with the prevailing doctrine. Dicta, supposed to be inconsistent, are summoned to the support of a contrary position. They will be considered later on. Whatever their significance, they cannot overcome decisions directly to the point. As often as the question has been squarely up, the answer has been consistent that there is no liability in tort. Some of the decisions rejecting liability are judgments of this court (*Kushes v. Ginsberg,* 188 N. Y. 630, affg. 99 App. Div. 417; *Sterger v. Van Sicklen,* 132 N. Y. 499; cf. *Reynolds v. Van Beuren,* 155 N. Y. 120, 125; *Wolf v. American Tract Soc.,* 164 N. Y. 30, 35; *Golob v. Pasinsky,* 178 N. Y. 458, 461). Others too many to be fully numbered are in courts of intermediate appeal (*Schick v. Fleischhauer,* 26 App. Div. 210; *Frank v. Mandel,* 76 App. Div. 413, 417; *Stelz v. Van Dusen,* 93 App. Div. 358; *Boden v. Scholtz,* 101 App. Div. 1, 2; *Pernick v. Central Union Gas Co.,* 183 App. Div. 543). The doctrine, wise or unwise in its origin, has worked itself by common acquiescence into the tissues of our law. It is too deeply imbedded to be superseded or ignored. Hardly a day goes by in our great centers of population but it is applied by judges and juries in cases great and small. Countless tenants, suing for personal injuries and proving nothing more than the breach of an agreement, have been dismissed without a remedy in adherence to the authority of *Schick v. Fleischhauer* and *Kushes v. Ginsberg.* Countless visitors of tenants and members of a tenant's family have encountered a like fate. If there is no remedy for the tenant, there is none for visitors or relatives present in the tenant's right (*Miles v. Janvrin, supra,* at p. 440; *Elefante v. Pizitz,* 182 App. Div. 819, 821). Liability has been enlarged by statute where an apartment in a tenement house in a city of the first class is the subject of the lease (*Altz v. Lieberson,* 233 N. Y. 16). The duty in such instances is independent of the contract. It is one imposed by law, with liability in tort where the duty is ignored. Here the plaintiff was injured in the use of a garage. His remedy is against the tenant at whose invitation he was there.

"We have spoken of dicta that are cited to the contrary. They do not touch the liability of the landlord for conditions within the premises affecting only the lessee or those who enter upon the premises in the right of the lessee. They have to do with nuisances threatening danger to the public beyond the land demised (cf. *Sterger v. Van Sicklen, supra,* at p. 501; *Ahern v. Steele,* 115 N. Y. 203, 209; *City of Brooklyn v. Brooklyn City R. Co.,* 47 N. Y. 475, 483; *Clancy v. Byrne,* 56 N. Y. 129; *Jaffe v. Harteau,* 56 N. Y. 398; *Brady v. Klein, supra;* 18 Halsbury, Laws of England, sec. 989; 21 id. secs. 651, 955). Even when thus confined, they are dicta, and nothing more, at least in this state, though reiteration may have given them an authority not otherwise belonging to them. Be that as it may, the fact remains that the decision in every instance exonerated the lessor. One case, it is true, there is (*Kilmer v. White,* 254 N. Y. 64, 69), which had to do with conditions within the premises, and not with those outside, but it cites *Jaffe v. Harteau, supra,* and does not suggest even remotely a purpose to establish a new rule. There is merely a cautious reservation of the doctrine to be applied in situations different from any before us at the time."

The minority doctrine as to the liability of owners who have made covenants to repair has, it is said, won the approval of the American Law Institute. This statement, to be correct, must, as applied to the facts here presented, be modified. Restatement, Torts, sec. 356, reads as follows:

"Except as stated in sections 357 to 362, a lessor of land is not liable for bodily harm caused to his lessee or others upon the land with the consent of the lessee or a sublessee by any dangerous condition whether natural or artificial which existed when the lessee took possession."

The effect of the section quoted is to reaffirm the rule of exemption of the landlord, already stated, but subject to six exceptions, viz.: (1) Where lessor covenants to repair; (2) concealed dangerous condition on demised premises; (3) when land is leased for a purpose involving admission of numerous persons; (4) where part of the demised land

is retained in lessor's control which lessee is entitled to use; (5) when part of the land is retained in lessor's control but such part is necessary to the safe use of the part leased; (6) where negligent repairs are made in the leased premises by the lessor.

It is obvious that only the first and second of the exceptions above referred to can possibly have any application to the instant case.

The first exception referred to is stated in the following language, in Restatement, Torts, sec. 357:

"A lessor of land is subject to liability for bodily harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession, if

"(a) the lessor, as such, has agreed by a covenant in the lease or otherwise, to keep the land in repair, and

"(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented."

But, this language is construed by the Restatement under the heading of "Comment, Nature of lessor's duty," in part, as follows:

"Since the duty arises out of the existence of the contract to repair, the contract defines the extent of the duty. Unless the contract stipulates that the lessor shall inspect the premises to ascertain the need of repairs, a contract to keep the interior in safe condition subjects the lessor to liability if, but only if, reasonable care is not exercised after the lessee has given him notice of the need of repairs."

In the instant case the terms of the covenant or contract to repair are not pleaded by plaintiff, either according to legal effect or verbatim. At all events, defendant's answer includes a general denial. The only evidence introduced at the trial relating to this subject of covenant or agreement to repair is certain parts of a deposition of Joy M. Hackler, president of the defendant corporation, taken by plaintiff prior to the trial, and which were received in evidence by

the trial court, not as a technical deposition, but as amounting to declarations against interest of the declarant.

For this purpose the plaintiff caused to be read in evidence the following questions and answers: "Q. Who pays the expenses of the upkeep of the garage; that is, of the building itself? A. We paid the taxes, insurance, and things like that. Q. And if there are any repairs to be made, who makes them? A. There has been very little of that to do, but if it amounted to anything, we would have to pay them." The following portion of this deposition was then read in evidence by the defendant: "Q. Do you have any arrangement with Mr. Monico about making any alterations or changes in the building, or floor plans, or floors or partitions? A. Not particularly, except I believe he filled one of the pits and leveled it up so that it would be on the level of the street, so that they could drive cars in there." Then, after testimony that Herman Monico rented the building from the defendant company in September, 1932, these further questions with answers thereto were read in evidence by defendant: "Q. Do you have a written lease with him? A. Yes, sir. Q. Is it on record? A. No. Q. When was that lease executed? A. In September, 1932. Q. For what period of time did it run? A I could not answer that without looking at it."

This written lease was not introduced in evidence, nor is the substance of its terms otherwise set forth in the record. Plaintiff, it appears, has wholly failed to set forth his case on this point by either affirmative allegation in pleading or competent proof by way of evidence. This conclusion is not only sustained by the text and comment of the Restatement, already referred to, but even the minority decisions, which alone support even the qualified statement of the minority rule, also premise it with the following:

"The landlord must, however, in order to be liable, have bound himself to repair, and a mere reservation of the right to enter and inspect and make such repairs as he may see fit is not deemed the equivalent of a covenant to repair.

Nor will mere custom of the lessor to make repairs, without any agreement, suffice to render him liable." 16 R. C. L. 1064, sec. 585.

"Where repairs are gratuitously made by the landlord, such fact is not an admission of liability on the part of the landlord to make repairs generally and keep the premises in repair." 36 C. J. 232.

It follows that under the facts disclosed by the present record there can be no recovery by the plaintiff on the theory of an existing covenant to repair and its breach by the defendant.

Plaintiff's contention is stated in his brief in the following terms:

"Where premises are leased for a public or semipublic purpose, and the lessor knows at the time of leasing that a dangerous condition exists thereon which renders the premises unsafe for the use intended, the lessor is liable for injuries sustained on account thereof by third persons rightfully on the premises in connection with the use for which same were demised."

The American Law Institute's Restatement of the Law of Torts, section 359, as merely an express exception to the general rule stated in section 357, already quoted herein, provides:

"A lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee, is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor

"(a) knew or should have known of the condition and realized or should have realized the unreasonable risk to them involved therein, and

"(b) had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their reception."

Here again it is to be noted that the "Comment" to this section of the Restatement points out that liability is limited to the lessee's patrons who are admitted for the particular

purpose of using the land for the particular purpose for which it was leased. Thus, the language of the "Comment" on this point is:

"Ambit of liability. * * * He (lessor) is not subject to liability to those licensees whose character as business visitors is derived from the fact that they come upon the premises primarily upon their own business concerns, such as persons coming upon the premises to deliver provisions or the like. Nor is the lessor subject to liability under the rule stated in this section to the social visitors of the lessee who utilize the place merely as a means of paying the lessee a social call which has no relation to the purposes for which the land is held open to the public." Restatement, Torts, p. 972.

Bearing in mind the limited and restricted ambit of liability of the rule above quoted, these facts are undeniable, viz.: That plaintiff, prior to receiving the injuries in suit, never declared to the representative of the lessee then present the purpose of his coming into the leased garage on March 1, 1935; and that only after the injuries in suit had been received did he first make the claim that he had entered this garage for two purposes only, viz.: (1) To collect for certain toys sold to the lessee prior to the preceding Christmas, a matter wholly unconnected with the garage business; and (2) to collect for certain damages sustained by an automobile owned by him during a week it had been stored in this garage in the preceding September. It further appears that this automobile had been withdrawn from such storage during this same month of September and had never been returned to this garage. It also appears that no express invitation was ever extended to the plaintiff to go where his injuries were received. But, even if an invitation of some sort is to be implied in the instant case, the owner's liability for the condition of his premises is only coextensive with the limited invitation such facts establish necessarily, if any. *Coberth v. Great Atlantic & P. Tea Co.*, 36 App. D. C. 569; 45 C. J. 830.

And, in addition, to entitle a person to recover for in-

juries as an invitee, he must show that at the time of the injury he was using the premises for the purpose contemplated by such invitation. 20 R. C. L. 69, sec. 60. If the invitee goes beyond the bounds of his invitation he acts at his peril. *Landy v. Olson & Serley Sash & Door Co.*, 171 Minn. 440, 214 N. W. 659; *Schmidt v. George H. Hurd Realty Co.*, 170 Minn. 322, 212 N. W. 903; *Menteer v. Scalzo Fruit Co.*, 240 Mo. 177, 144 S. W. 833.

In other words, a person may not be deemed an invitee when using a part of the premises to which the invitation did not extend. *Keeran v. Spurgeon Mercantile Co.*, 194 Ia. 1240, 191 N. W. 99, 27 A. L. R. 579; *Faris v. Hoberg*, 134 Ind. 269, 33 N. E. 1028; *Collins v. Sprague's Benson Pharmacy*, 124 Neb. 210, 245 N. W. 602.

A public garage, such as is involved in the instant case, may be defined to be one devoted to the safe storage of automobiles and property contained therein. The office provided for the convenience of the public, a safe way of access thereto, and of entry of automobiles to be stored, and their removal therefrom, constitute the extent of the public invitation. The very nature of the business carried on and the responsibility for safe storage and return of property received by the proprietors preclude the existence of an implied invitation to persons generally, unaccompanied by automobiles and without interest in automobiles in storage, to come upon the portion of the premises devoted to storage, pass through and between automobiles then kept, and loiter about to suit their own convenience and purpose. It is only by the maintenance of a substantially exclusive control of the property bailed to them that proprietors of public garages may efficiently perform the obligations they assume.

In the instant case, under the circumstances clearly established in the record, the plaintiff could not be deemed an implied invitee to the portion of the premises where the injuries were received. *Johnson v. Mau*, 60 N. Dak. 757, 236 N. W. 472; *Southwest Cotton Co. v. Pope*, 25 Ariz. 364, 218 Pac. 152; *Cowen v. Kirby*, 180 Mass. 504, 62 N. E. 968.

The plaintiff, at the place where his injuries were received, was clearly within the purview of the rule that "The owner or occupier of real property is under no obligation to make it safe, or to keep it in any particular condition, for the benefit of trespassers, intruders, mere volunteers, or bare licensees, coming upon it without his invitation, express or implied." 1 Thompson, Commentaries on the Law of Negligence (2d ed.) sec. 945.

It follows therefore that the trial court erred in overruling defendant's motion for a directed verdict in its favor, and in overruling its motion for a new trial.

Therefore, the judgment of the district court is reversed and the action dismissed.

REVERSED AND DISMISSED.