MARTIN FLYNN V. PAN AMERICAN HOTEL COMPANY.

No. A-180. Decided November 8, 1944.
Rehearing overruled December 6, 1944.
(183 S. W., 2d Series, 446.)

220

*Elmer Ware Stahl* and *A. R. Sohn,* of San Antonio, for petitioners.

It was error for the Court of Civil Appeals to hold that the trial court properly instructed the jury to return a verdict for

respondent because the evidence showed that respondent, the landlord, had attempted to make the repairs but did so in a negligent manner; that, even though there was no covenant in the lease contract as to repairs, the evidence disclosed that respondent did reserve the right to make repairs at the expense of the lessee; that respondent was in control of the building and had employed a paid mechanic to keep the elevators in repair, and that such mechanic had attempted to do so. Anglin v. Cisco Mtg. Co., 135 Texas 188, 141 S. W. (2d) 935; Thomas v. Postal Tel. Cable Co., 65 S. W. (2d) 282; Wallace v. Southern Cotton Co., 91 Texas 18.

*Johnson & Rogers* and *Nat L. Hardy,* all of San Antonio, for respondent.

There being no express agreement by the landlord to repair the defective conditions on the premises and he not being guilty of any fraud or concealment by failing to disclose hidden defects of which he had knowledge, the tenant assumes the risk of their safety and the landlord is not liable to him or to any person entering under his title or by his invitation for injury caused by reason of the unsafe condition. Morton v. Burton-Lingo Co., 136 Texas 263, 150 S. W. (2d) 239; Perez v. Rabaud, 76 Texas 191, 13 S. W. 177; Yarbrough v. Booher, 141 Texas 420, 174 S. W. (2d) 47; 32 Am. Jur. 546.

MR. JUDGE SMEDLEY, of the Commission of Appeals delivered the opinion for the Court.

Respondent Pan American Hotel Company, the owner of the property known as the St. Anthony Hotel in San Antonio, leased the building with furniture, fixtures and equipment, by written lease for a term of three years beginning July 1, 1935, to another corporation, New St. Anthony Hotel Company, which by the terms of the lease agreed to operate the property as a hotel and "to keep and maintain the same in good condition and in good state of repair, both as to the building, premises and the furniture and fixtures therein, throughout the full term hereof."

Petitioner Flynn, employed by New St. Anthony Hotel Company as its "back door man," was injured February 5, 1937, when the "back elevator," on the floor of which he was standing, dropped and he was caught between the elevator and the wall. Petitioner, as an employee of New St. Anthony Hotel Company, which was a subscriber under the Workmen's Compen-

sation Law, collected compensation in the total sum of $3,562.59 from the insurer, on account of his incapacity resulting from the injury and brought this suit against respondent for himself and his employer's insurer, alleging that the injury was caused under circumstances creating a legal liability in respondent, a corporation other than the subscriber. (Art. 8307, Sec. 6a, Rev. Civ. Stat. of 1925). The Court of Civil Appeals affirmed the judgment of the trial court, rendered after instructed verdict, that petitioner take nothing by his suit. 179 S. W. (2d) 849.

Recovery is sought on three grounds; negligence of respondent in the manner of making repairs when it undertook to repair and remedy the dangerous and defective doors of the elevator; negligence of respondent in failing to exercise ordinary care to maintain the elevator in repair; and the failure of respondent to equip the elevator with a device that would prevent moving it when the gate or door thereto is open, as required by statute. Acts Reg. Sess. 39th Leg., Ch. 29; Arts. 6145a and 6145b, Vernon's Ann. Civ. Stat. and Art. 1661a, Vernon's Ann. Penal Code).

The elevator by which petitioner was injured was near the back door of the hotel. It was used primarily for freight, but was also used by porters and other employees of the hotel, by Western Union messenger boys, and often by guests. Petitioner was stationed at the back door, it being his duty to make a record of all provisions and goods that came into the hotel and to examine all outgoing packages. A door led from the elevator shaft into the ball room of the hotel and it was the duty of petitioner each night before he went home to see that the door was locked. To do this it was necessary for him to enter upon the floor of the elevator. On the night when he was injured he had entered the elevator to see that the door was locked and after he put his foot on the landing and was about to step out, the elevator dropped and he was caught between the elevator and the wall.

The elevator had two sides but no front and no back. There were no doors on the elevator itself, but there was a wire mesh door covering the entrance to the elevator shaft to prevent persons from falling into the shaft when the elevator was up. At the time when petitioner was injured the elevator had not been equipped with interlocking doors or any other device that would prevent its ascent or descent when the door or gate of the elevator was open. A witness or witnesses testified to a defective condition in the direction lever of the elevator, in

that a spring that held the lever in neutral position was broken or missing and a jar would cause the direction lever to drop and the elevator to move. There is evidence tending to prove that petitioner would not have been injured if the elevator had been equipped with interlocking doors or a similar safety device of if the direction lever had been repaired.

■ The general rule with respect to the duty of the lessor or landlord to make repairs, when the suit is by the tenant or the tenant's servant or others entering under the tenant's title, is that the landlord is under no obligation to make repairs in the absence of an agreement to the contrary. Perez v. Rabaud, 76 Texas 191, 13 S. W. 177, 7 L. R. A. 620; Morton v. Burton-Lingo Lumber Co., 136 Texas 263, 150 S. W. (2d) 239; Yarbrough v. Booher, 141 Texas 420, 174 S. W. (2d) 47; 50 A. L. R. 1369; Ross v. Haner, (Com. App.) 258 S. W. 1036; Fort Worth & Denver City Railroad Co. v. Mills, 140 S. W. (2d) 513; 36 C. J. pp. 125-127, Sec. 766; 32 Am. Jur. pp. 521-523, Sec. 657. However, when the landlord, although he may be under no obligation to make repairs, does undertake to make them, he is liable for injuries resulting from his negligence or that of his servants or employees in making the repairs. Perez v. Rabaud, supra; Lynch v. Ortlieb & Co., 28 S. W. 1017, application for writ of error refused, 87 Texas 590, 30 S. W. 545; Ara v. Rutland, 172 S. W. 993, reversed on another point (Com. App.) 215 S. W. 445; 36 C. J. pp. 217-218, Sec. 900; 32 Am. Jur. pp. 547-552, Secs. 678-683.

Petitioner failed to make a case for the jury in that part of his suit by which he seeks to recover on account of negligence of respondent in the manner of repairing the elevator doors. The liability thus asserted is for negligence in the performance of what the landlord undertakes to do and there can be no recovery unless the injuries were the result of that negligence. 31 Am. Jur. pp. 551-552, Sec. 682. We find no evidence in the record tending to prove that petitioner's injuries were caused by negligence in the manner or method of making the repairs on the doors. Petitioner was injured when the elevator dropped or descended as he was about to step out of it. There is no evidence that the condition of the doors that had been repaired caused the elevator to drop or in any way caused petitioner's injuries. As has been said, the evidence tends to prove that petitioner's injuries were caused either by the defective condition of the direction lever or by the absence of interlocking doors. There is no evidence that respondent ever undertook to install interlocking doors on the elevator and no evidence that it ever

undertook to repair the broken direction lever and was negligent in repairing it.

Fay Chase, called as a witness by petitioner, testified that he was employed as elevator maintenance man at the St. Anthony Hotel from the latter part of 1935 until about June, 1936, being on the payroll of respondent Pan American Hotel Company for four months and thereafter on the payroll of the New St. Anthony Hotel Company; that during the whole period of his employment he took instructions from R. H. Morris, who was president of Pan American Hotel Company and from Thornton Miller, who was superintendent of construction for the remodeling done by the company; that it was a part of his duty to take care of the "back elevator";. that Westinghouse Elevator Company installed a new motor, a new control, and a new car switch station, which is a direction lever, on the elevator; that at Mr. Morris' direction in 1936 he procured bolts and patched up the doors as best he could, but they were beyond repair; that he suggested to Mr. Morris that they put collapsible doors on both ends of the elevator car, and even procured a price from the Westinghouse Company and submitted it to Mr. Miller; and that the car switch or direction lever was properly installed and was in proper repair when he left the hotel in June, 1936, and nothing had been done about installing collapsible doors. The testimony of Chase further shows that after he left the hotel and went to work at another place, and before Flynn's injury, he was in the hotel and saw that the direction lever had been broken.

The absence of interlocking doors or similar device to prevent the moving of the elevator was a defect or dangerous condition existing when the lease was executed. This defect or dangerous condition was apparent and there is no contention that respondent concealed it from the lessee. The rule in this state and in the other states, or most of them, is that when there is no agreement by the landlord to, repair the premises and he is not guilty of fraud or concealment by failing to disclose defects existing when the lease is made, he is not liable to the tenant, or the employees or others entering under the tenant, for injuries caused by such defects. The tenant takes the property as he finds it, assuming the risk of apparent defects. Perez v. Rabaud, 76 Texas 191, 13 S. W. 177, 7 L. R. A. 620; Morton v. Burton-Lingo Lumber Co., 136 Texas 263, 150 S. W. (2d) 239; Yarbrough v. Booher, 149 Texas 420, 174 S. W. (2d) 47; American Exchange National Bank v. Swope and Mangold, 46 Texas Civ. App. 64, 101 S. W. 872; Johnson v. Murray Co., 90 S. W. (2d) 920; Fort Worth & D. C. Ry. Co. v.

Mills, 140 S. W. (2d) 513; Harris v. Lewistown Trust Co., 326 Pa. 145, 191 Atl. 34, 110 A. L. R. 749, and note pp. 756-761; 36 C. J. pp. 125-127, Sec. 766, pp. 204-207, Secs. 874-877; 32 Am. Jur. pp. 515-517, Sec. 654. The rule is different as to the landlord's liability for injuries to third persons, or strangers to the premises, from defects existing when the lease was made. Marshall v. Heard, 59 Texas 266; Perez v. Rabaud, 76 Texas 191, 13 S. W. 177, 7 L. R. A. 620; Texas Company v. Freer, 151 S. W. (2d) 907; Harris v. Lewistown Trust Co., 326 Pa. 145, 191 Atl. 34, 110 A. L. R. 749, and note pp. 756-761; Webel v. Yale University, 125 Conn. 515, 7 Atl. (2d) 215, 123 A. L. R. 863 and note p. 870 et seq.; 32 Am. Jur. pp. 638-664, Secs. 755-777. That rule will not be discussed because petitioner was an employee of the lessee and, as held by the authorities which have been cited, the employee of the tenant or lessee occupies no better position as against the landlord than that of his employer.

The broken direction lever was a condition that arose from the operation of the property after the execution of the lease; and the correction of that condition was a matter of ordinary repair or maintenance, with the obligation to make the correction resting upon the lessee according to the terms of the lease. Petitioner contends that notwithstanding the terms of the lease, there is evidence from which it could reasonably be inferred that, either according to the true contract of the parties or by subsequent modification of the contract, it was agreed that respondent, the lessor, should keep the building and equipment in repair. For evidence of the existence of such agreement petitioner relies, generally stated, upon certain provisions of the lease and upon acts of the lessor in making improvements and repairs.

The lease provides that the lessee shall pay the lessor as rental the following amounts: (1) approximately $4,000.00 per month, payable on the first day of each month during the term of the lease; (2) "an amount equivalent to ten (10%) each year on any and all advances made and expenses incurred by lessor for the purpose of improving and/or maintaining the property or premises covered by this lease"; (3) "an amount equivalent to seventy-five (75%) of the annual net earnings accruing to the lessee from the use and operation of the property and premises." The term "annual net earnings" is defined as all revenues received by the lessee from the use and operation of the property after deducting all amounts necessary to pay current liabilities, including all operating expenses, the rental provided in

paragraphs (1) and (2) and all tax assessments against both the lessor and the lessee, "together with sufficient cash set aside to establish an adequate reserve for maintaining the building, its equipment, furnishings and appurtenances of every description so that the appearance and operating efficiency of the hotel, equipment, furnishings and appurtenances shall not be impaired."

The provision of the lease which binds the lessee to operate the property as a hotel and to keep and maintain the building premises, furniture and fixtures in good condition and good state of repair has been quoted. A paragraph of the lease provides that in the event of the loss or destruction of the hotel building through fire, lessor shall have the option to rebuild the hotel property or declare the lease terminated. In another paragraph the lessee agrees "that it will not without the written consent of the lessor make any changes or permanent improvements on these premises or in the building, lessor covenanting hereby that the said lessee shall have and enjoy full and peaceable possession of the entire premises during the term hereof." The lease contains no reservation to the lessor of any part of the building or premises.

We do not find in those parts of the lease that have been stated and quoted, or anywhere in the lease, any evidence of an agreement on the part of the lessor to make any certain improvements or to keep the property or any part of it in repair. The provisions of the lease manifest the lessor's interest that the property shall be maintained in good condition, but they impose no obligation upon the lessor to maintain the property or to improve it. They contemplate that the lessor may make improvements or repairs and they obligate the lessee to make payment of a part of lessor's expenditures made for those purposes, if the lessor elects to make them. The lessee is required to obtain the lessor's consent to any changes or permanent improvements that it may desire to make. These are reasonable provisions for the protection and benefit of the owner of the property and they are not contradictory of the lessee's agreement in the lease to keep and maintain the property in good repair.

The statement of facts contains evidence showing that from September, 1935, and thereafter into the year 1938 respondent, Pan American Hotel Company, made extensive repairs, improvements, replacements and additions on the hotel property, expending approximately one million dollars, and that in the

period from 1938 'to 1943 it spent a considerable amount for improvements, buying a corner lot and erecting a new building thereon. It is apparent that the lessee acquiesced in the making 'of these repairs and improvements and permitted respondent to have access to the building to do the work, but there is no evidence tending to prove that the repairs, replacements or improvements were made pursuant to an agreement that they would be made by respondent.

In the year 1936 Westinghouse Eelevator Company, under contract with respondent, installed a new motor, a new control, and a new control switch station on the "back elevator." . The motor and control are in the penthouse at the top of the shaft. The control switch is the direction lever that is controlled by the operator of the elevator. Fay Chase, who was a witness for petitioner, testified that he was an employee of Pan American Hotel Company and that, while the replacements were being made by the Westinghouse Company, he put new wainscoting, a new top and a new platform on the "back elevator." The material for this work was furnished by respondent. The testimony of this witness that he repaired the doors with bolts at the request of respondent has hereinbefore been stated. The time when this work was done on the elevator was not definitely shown. It must have been done several months before February 5, 1937, when petitioner was injured, not later, it seems, than June 1936, for Fay Chase testified that he left the hotel in June, 1936, and took other employment.

About three months after petitioner was injured new doors and interlocks were installed on the "back elevator" by Westinghouse Elevator Company, under contract with respondent, at a cost of $2,115.00, and the cost of these improvements was set up in respondent's capital account. When asked why respondent installed the new doors and interlocks after Flynn's injury, R. H. Morris, respondent's president, testified: "Well, there is some work that we have done over there that was not done when we turned the building over to the St. Anthony Hotel Company, and any of that work that is found we do it. Even now we are doing little jobs, and the Pan American Hotel Company puts that into the capital account."

■ The foregoing facts in evidence showing that respondent improved and repaired the property, including the "back elevator," are not evidence of an agreement by respondent to make improvements or repairs. This rule was discussed at length in Yarbrough v. Booher, 141 Texas 420, 174 S. W. (2d) 47, 150 A. L. R. 1369, with citation of a number of authorities. The

opinion in that case quotes with approval from American Jurisprudence as follows:

"The fact that the landlord makes repairs does not impose on him a duty to keep the demised premises in repair or liability for damages for injuries caused by a failure to keep the premises' in repair. The landlord's custom of making repairs does not import into the lease an agreement to keep the leased premises in repair. The making of repairs does not constitute an admission of any duty to keep the leased premises in repair. Nor is it evidence of an agreement to keep the premises in repair. Nor does it operate to make a new or collateral agreement to keep the premises in repair." 32 Am. Jur., pp. 546-547, Sec. 677.

See also the following authorities: Morton v. Burton-Lingo Lumber Co., 136 Texas 263, 267, 150 S. W. (2d) 239; Brown v. Dwight Mfg. Co., 200 Ala. 376, 76 So. 292, L. R. A. 1917F, p. 997, and note pp. 998-99.

Installation, by respondent, of new doors and interlocks on the "back elevator" after petitioner's injury, with the explanation by respondent's president that it was work that was not done when the building was turned over to the lessee, tends to prove or proves that a dangerous condition known to the lessor existed when the lease was made, but it is not evidence of an agreement or of an obligation on the part of the respondent in favor of the lessee to remedy the condition, and it would not change the rights and obligations of the parties under the lease contract nor the rule that the landlord is not liable to the tenant, and those entering in the tenant's right, for injuries caused by defects, not concealed, existing when the lease is made. As said in Morton v. Burton-Lingo Lbr. Co., 136 Texas 263, 268, 150 S. W. (2d) 239; "The real basis of liability under any theory is predicated upon a legal duty and the default of such legal duty." The record in this case contains no evidence tending to prove an agreement or any state of facts that would impose a legal duty upon respondent, in favor of the tenant or the tenant's employees, to keep the "back elevator" in repair or to improve its condition by equipping it with interlocking doors.

■ Petitioner contends further than an obligation on the part of respondent to repair the property, and particularly the "back elevator," may be implied from the control that respondent exercised over the building and the elevator. The question of control as creating a duty to repair usually arises when leases are made of parts of a building, as for example an apartment house, and there are hallways or stairs used in common by the tenants.

In such cases the general rule is that if the landlord in making the lease has retained possession and control of part of the building it is his duty to exercise reasonable care to keep that part in repair. Maionica v. Piscopo, 217 Mass. 324, 104 N. E. 839; 32 Am. Jur. pp. 561-566, Sec. 688-690.

The terms of the lease, which have been stated, and the acts of the parties to the lease show that it was contemplated and intended that respondent should have the right to enter on the property to make improvements and repairs; but the reservation by a lessor of a right to enter the premises to make such repairs and alterations as it may elect to make is not a reservation of control over a part of the building and an obligation on the part of the lessor to make repairs does not arise from the reservation of such right. Stone v. Sullivan, 300 Mass. 450, 15 N. E. (2d) 476, 116 A. L. R. 1223.

The whole of the property, including the "back elevator," was leased to the New St. Antohny Hotel Company, to be possessed and operated by it as a hotel, and it was so possessed and operated by that company. The control that respondent exercised of parts of the leased property was, under the evidence, only that occasional and temporary possession and use that were necessary or proper for making the improvements and repairs that it undertook to make.

This is true as to the "back elevator" as well as to other parts of the leased property. There is testimony that Fay Chase, as an employee of respondent for a period of several months ending in June, 1936, had as a part of his duties the maintenance of the "back elevator," that is keeping it in operating condition, and made repairs on it, and that during that time neither the chief engineer nor the night engineer of the lessee, New St. Anthony Hotel Company, made repairs on the elevator. The record does not show who kept or undertook to keep the elevator in repair from June, 1936, until February, 1937, when petitioner was injured. The direction lever was broken sometime during the period last mentioned. The lessee's night engineer testified that he put a new jumper on the controller, which is at the top of the elevator shaft, sometime in 1937, and before petitioner was injured, and the lessee's chief engineer testified that he knew the spring in the direction lever was broken, that he tried to get a new spring and would have put a new spring in the lever if he had been able to get it.

As has been said, there is no evidence that Fay Chase negligently made the repairs that he did make and no evidence that

petitioner's injuries were caused by the manner in which those repairs were made; and (assuming that Chase was respondent's employee) the fact that he did make repairs.is not evidence of an agreement by respondent to make other or further repairs.

■ We approve the conclusions expressed by the Court of Civil Appeals with respect to the policy of general liability insurance offered in evidence by petitioner. The policy was issued to Pan American Hotel Company and New St. Anthony Hotel Company as the insured. It in no way tends to prove an agreement between the two corporations that the Pan American Hotel Company would keep the elevator in repair, or any other facts that would impose a legal duty upon respondent in favor of the New St. Anthony Hotel Company, or its employees, to repair òr improve the elevator.

■ Pleading in the alternative, petitioner alleged in his petition that respondent as the owner of the hotel building was required by statute to equip the "back elevator" with a device that would prevent moving the elevator with its gate or door open, and that respondent's failure to perform that statutory duty approximately caused petitioner's injury.

The statute relied upon, being Chapter 29, Acts of the Regular Session, 39th Legislature (Articles 6145a and 6145b, Vernon's Annotated Civil Statutes, and Article 1661a, Vernon's Annotated Penal Code) is as follows:

"Section 1. It shall be unlawful, after the 1st day of January, 1926, to operate passenger elevators for the carriage of passengers in any building within this State, until the same shall be equipped with a device that will prevent moving said elevator when the gate or door thereto is open; provided, however, that the installation of any such device, the design of which shall have been approved either by the United States Bureau of Standards, or by the Industrial Accident Board of the State of Texas, shall be prima facie evidence of a compliance with this Act.

"Sec. 2. It is hereby made the duty of the Industrial Accident Board to inspect and approve or disapprove the model, drawing, or design of any such devices as may be submitted to it in Austin, Texas, and to charge therefor a fee of $10.00.

"Sec. 3. Any person, or the members of any partnership, owning, leasing or in charge or control of any building or edifice

operating passenger elevators, and the board of directors, president, general manager, or other agent or employee of any corporation, or any trustee or receiver of such corporation, which is the owner, lessee, or in charge of any such building or edifice operating passenger elevators therein, who shall violate the provisions of this Act shall each be guilty of a misdemeanor, and upon conviction shall be fined not less than five ($5) dollars nor more than twenty-five ($25), and each day such elevator is operated without such device shall constitute a separate offense."

Section 1 of the statute defines the offense. It declares that it shall be unlawful to *operate* passenger elevators until they are equipped with the safety device. Section 3 names those who shall be fined for violating the provisions of the act. The offense is the operation of the elevator before it has been equipped with the device. The penalty is imposed upon the person operating the elevator, whether he is an individual or a member of a partnership, owning; leasing or in charge or control of the building, or a director, president, general manager, agent, employee, trustee or receiver of a corporation which is the owner, lessee or in charge of the building.

Respondent did not operate the "back elevator." The lessee, New St. Anthony Hotel Company, under the terms of the lease and in fact, operated the leased property, including the elevator.

We have carefully examined all of the authorities cited by petitioner in support of his contention as to statutory duty. Two of them are referred to in the opinion of the Court of Civil Appeals. All of those authorities involves statutes that, either expressly or by clear implication, impose upon the owner of the property the duty to construct or provide the safety device or equipment. The statute relied upon in some of those cases, by express language, make it the duty of the property owner to provide the safety device. Others in mandatory terms provide that the safety device shall be constructed or installed. The statute involved in the instant case nowhere expressly places upon the owner of the building the duty to provide the device and nowhere provides that the device or equipment shall be constructed or installed. It undertakes to accomplish its purpose by prohibiting the operation of elevators until they have been equipped with the device and it intends to punish those who do operate elevators before they have been thus equipped.

The statute is not ambiguous. The caption, "An Act to protect life and limb by requiring safeguarding of all passenger

elevators, etc.", cannot be given the effect of imposing a statutory duty that the body of the act does not impose. The statute does undertake to safeguard elevators but uses the indirect method of prohibiting their operation until they have been equipped with the safety device. Although the statute is a police regulation designed to protect human life and limb, the court would not be justified in giving it a meaning which, according to its plain language, the legislature did not intend.

The judgments of the district court and the Court of Civil Appeals are affirmed.

Opinion adopted by the Suprme Court November 8, 1944.

Rehearing overruled December 6, 1944.