### RENFRO DRUG CO. et al. v. LEWIS.

### No. 9841.

Court of Civil Appeals of Texas. Austin.

Feb. 15, 1950.

Rehearing Denied March 8, 1950.

Coleman Gay, of Austin, Attorney for Appellant Capital National Bank in Austin.

Hart, Brown & Sparks, of Austin, Attorneys for Appellant Renfro Drug Co.

Will Mann Richardson, of Austin, and Ralph Yarborough, of Austin, for Appellee H. L. Lewis.

Graves & Dougherty, and Looney, Clark & Moorhead, all of Austin, for Appellee Edward Joseph.

HUGHES, Justice.

H. L. Lewis sued Renfro Drug Company, a corporation, Edward Joseph, doing business as the Motoramp Garage, and the Capital National Bank in Austin, a banking corporation, for damages for personal injuries sustained by him in a fall in a doorway between the garage and the drugstore.

In a non-jury trial Lewis recovered a judgment, the amount of which is not criticized. This judgment was against Renfro and the Bank, jointly and severally, but with judgment over against the Bank in favor of Renfro, by way of indemnity. The Garage, or Joseph, was exonerated from liability to Lewis and Lewis has not appealed. The Bank and Renfro have appealed, and the Motoramp Garage is before the court on the Bank's plea for indemnity or contribution.

No findings of fact or conclusions of law were requested and none were filed by the trial court.

We will first determine whether or not the judgment in favor of Lewis, as distinguished from the judgment for or against any of the other parties, is supported by the law and the evidence, the contention being that Lewis was, as a matter of law, guilty of contributory negligence, and that he had failed to prove actionable negligence on the part of those he sued, which was the proximate cause of his fall.

Mr. Lewis was injured on March 26, 1948. He was then a resident of Marfa, Texas, and 68 years old. While on the way to visit Dr. W. P. Morgan, who officed in the Capital National Bank Building, he sustained his injuries.

The Bank owned the premises occupied by the Motoramp, Renfro's, the office building, and the bank. They are located on the north side of West Seventh Street in Austin. Commencing on the west is the Motoramp Garage, a public storage garage, adjoining on the east is Renfro's Drugstore, and adjoining the drugstore on the east and connected by two doors, is the elevator lobby of the office building, and to the east

and adjoining are the Bank's quarters. West Seventh Street, where these buildings are, declines rather sharply from west to east, the fall being 45 inches in the half block occupied by these buildings. There is an opening, a door, between the garage and the drugstore. The picture of the doorway, inserted below, will help explain the facts and various contentions of the parties:

and was closed when Mr. Lewis opened it to enter the drugstore. This door is kept closed by a standard closing device called a door check. The door has on it three signs. At the top and at about the eye level of the average adult is the sign, "Caution, Watch Your Step." The sign is in red letters of about 3" in height on a white background. Then, the sign, "Renfro

This picture was taken from inside the drugstore, facing the door and entrance to the garage on the west.

The door is of solid metal, weighing approximately 225 pounds. While the picture shows the door open it is ordinarily closed

No. Two, Prescription Pharmacy," appears. Below this, and not visible in the picture, is a smaller sign reading, "Watch Step."

This door opens into the drugstore and away from the garage and opens directly over the steps, there being no platform in-

side the drugstore on the same level as the garage floor. The first step taken from the garage to the drugstore is down the height of the top step or riser which is 8½", and the next step or riser down to floor level of the drugstore is 8⅛", or a total difference in floor levels between the garage and the drugstore of 17¼". There is probably a half inch variation in these measurements due to the worn condition of the edges of the step. The width of the tread or step was 17".

Also, to be noted is the fact that this door is recessed from 12" to 14" in the garage side of the wall.

As negligence proximately causing his injuries, Mr. Lewis pleaded:

1. The door opened immediately upon an abrupt step-down, without having a platform inside the door on a level with the garage door;

2. The heavy solid door masked from Mr. Lewis the difference in floor levels;

3. The solid door opened inward over the step-down, preventing the user from seeing the step-down in time to observe and avoid the danger;

4. The door closer was adjusted in such a manner that it required strength to overcome a strong initial tension and then opened easily, causing the user to plunge rapidly through the door without an opportunity to observe the dangerous step;

5. The strong hydraulic automatic closer was out of adjustment, causing the door, after being opened, to jerk back rapidly, forcefully, and unexpectedly against the user;

6. The tread of the step was of marble, which had become worn, slick and uneven;

7. The step was worn so that it sloped forward and downward;

8. The lack of a corrugated metal or rubber nosing for the front edge of the step, to prevent slipping;

9. The lack of a handrailing by the steps;

10. The provision and maintenance of the entrance and steps in the manner and condition in which they were on March 26, 1948;

11. The risers of the steps were unusually high and unsafe, and

12. The steps were of unusual and unsafe dimensions, in that the sum of the width of the tread and the height of the riser was so great that the steps could not be used without interruption of the normal gait of the average user, and Mr. Lewis was using his normal gait, which was approximately that of the average user.

All of such alleged grounds of negligence are established by the physical facts, except those relating to the state of repair of the door check and the manner of its operation.

■ We have no way of knowing upon what facts the trial court based its judgment. We are of the opinion, however, that all grounds of negligence have ample support in the evidence, except No. 5 relating to the door check being out of repair. As to this ground the evidence is not sufficient to support a judgment.

Mr. Roy L. Thomas, Mr. Clifford James, and Mr. Martin Stephen Kermacy, architects, testified concerning this door and step:

Mr. Thomas: "The door is a very heavy door, to begin with. I don't know what it weighs, but it is metal covered, and very heavy, and you not only have to push the weight of the door, but it has a fluid closer on it. You have to overcome the weight of the closer and the door too, and it makes a heavy door to open. These closers are set to close the door to, and you have to push against the pressure of that closer. * * *

"Well, first, a public stair that way with a very heavy door as that is, a metal clad door, opening directly over a step, there is only one and three-quarter inches from the nosing of the step and the door being very heavy and with a jack on it, and requires quite a push to open it, and it isn't good business to open a door over a step, and I never did that in my life, and you have no handrail, to begin with. It opens between two fixtures. The steps are badly worn at present. The top one is worn one-half inch, that marble there being soft,

and the second is worn three-eighths of an inch, hollowed out, making a very uneven step there. * * * the step isn't anywhere in proportion to what it should be. It is out of all standard architectural proportions."

Mr. James: "As you know in physics when you open a door, you exert a certain force, and in the exertion of force against a heavy metal door, or of any door, if it opens directly over a flight of stairs, you throw the body out of a certain balance; you get it off center if you push on the door and find yourself down a flight of stairs, it is much easier to lose control of your body equilibrium than if the door opened out before you walked through there."

Mr. Thomas: "* * * Of course, that door coming over there would never make it safe, and not having a rail would never make it safe. You would have to have a handrail to make it safe, and to get that door back from right on the riser."

Mr. Kermacy testified that the maximum riser recommended for a stair in a public building is 7¾" and that the width of a tread should be a minimum of 9½." And if, as in this case, the width of the tread is almost doubled the safety of using the step has been affected in that—"That has interrupted your stride, and makes you very uncomfortable in using it. It makes it unsafe, because it isn't safe to a normal man's stride. * * * it throws you out of kilter in the rhythm of your walk, which makes it unsafe, and makes a likelihood of your tripping."

According to Mr. Thomas the tread should not have been 9½", and that an irregular tread would break a man's stride, explaining:

"He is liable to lose his balance, if he is thrown off stride without any notice of any kind there, that he is going to have to change his length of his step. Those rules were not set up by me. I have got books here to substantiate that, if you all want to see them. * * *

"The structural design wasn't correct, not correct proportions at all. In fact, I never saw a stair with that proportion at all. That is the first I had ever seen."

Mr. James further testified that these steps were unsafe because, "there is no safety tread used on the step, such as rubber, terrazo, or other corrugated material which is in common usage and has been for a number of years."

Mr. Lewis was on his way to visit Dr. Morgan when he was injured. He had been to see Dr. Morgan before, and on one such occasion while he parked his car in the motoramp he did not see or use the door pictured above, which constitutes an exit from the motoramp and an entrance to Renfro's as well as a "short cut" or passageway to the elevator lobby of the Bank's office building.

On the day of the accident Mr. Lewis drove his car into the Motoramp Garage and stopped his car in the driveway on the extreme east side of the garage and immediately west of the partition wall. He then stepped upon a safety island immediately west of the driveway and waited there approximately one or two minutes before the garage attendant gave him a claim check for his car. The driveway is approximately twelve feet in width and the safety island is located across the driveway from the door into the drugstore.

Mr. Lewis had intended after parking his car to go out the front of the Motoramp Garage to Seventh Street and then to enter the elevator lobby from the street. While waiting for his claim check, however, he saw a man go through the door from the garage into the drugstore, and he observed while the door was open that it was an entrance into the drugstore. He then decided that he would use the door and go through the drugstore to the elevator lobby.

By the time the garage attendant handed him a claim check for his car, the car immediately ahead of his had been moved, and one of the garage employees had entered his car in order to move it from the driveway to storage. When Mr. Lewis received his claim check the garage employee in his car motioned for him to pass in front of his car toward the door to the drugstore, which he did.

The front of Mr. Lewis's car was stopped about 4 feet north of the north edge

of the door into the drugstore, so in passing in front of this car he must have been at least the same distance north of the door when he started walking down the wall to the door. He kept close to the wall because of cars passing and in order to protect himself from the danger of being hit.

In approaching the door in this manner, Mr. Lewis did not observe the signs on the door or the fact that the door was solid. On reaching the door he grabbed the handle of the door, presumably with his left-hand, and pushed inwardly and, in the words of Mr. Lewis:

"When I turned the knob and pushed the door open and started through, as I went into the drugstore, the door snapped back, and my feet slipped from under me, and everything from there went black. The next thing I found myself lying out in the floor when I come to myself.

* * * * * *

"When I came to the door, I caught hold of the knob, opened the door and passed through. As I passed through, the door jerked, my foot slipped, whatever it was on, and I fell and broke my hip."

On cross-examination Mr. Lewis testified:

"Q. Now, when you opened the door to go in, and when you pushed the door open, you saw the steps there, didn't you? A. No, sir.

"Q. You didn't see the steps? A. I didn't see any steps.

"Q. Did you look down? A. I can't say that I looked down or looked out either one—I suppose I did look down.

"Q. If you looked down, you saw the steps, didn't you? A. Well, if I looked down, I am bound to have saw the steps.

* * * * * *

"Q. You don't recall seeing the steps? A. But I must have saw something or I wouldn't have stepped blindly through, or I thought I did."

And on direct examination, when being asked what the signs on the door would have meant to him if he had read them,

he answered: "A. No more than the signs would show and the condition of the step. I don't think they could have meant anything. I would have went through and stepped blindly as I did and fallen."

Out of 359 pages of briefs filed by the parties, other than Mr. Lewis, only ten pages are devoted to the point that no actionable negligence was proved. The basis for this assignment is that all of the conditions claimed to constitute negligence, except maladjustment of the door check, were open and obvious to Mr. Lewis, and that such being the case, under the rule stated in Houston Nat'l Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374, negligence was not, as a matter of law, established.

We agree with the rule but not to its present applicability. Not a single ground of negligence was open and obvious to Mr. Lewis until too late. As Mr. Lewis edged along the garage wall towards the drugstore he was facing the broad open entrance to the front of the garage and the daylight which streamed through. The door was solid, it opened in, and it was impossible to peer through and observe the conditions to be encountered. The door was heavy. It required a considerable push to open. This was not the kind of a door which one would fling open and then pause to reflect as to how and in what manner entrance could be safely effected. This was a door which snapped back. Of necessity the push of the door and the step forward must be made simultaneously. At this moment all of the negligent conditions came into view but not in time for Mr. Lewis to guard against them. We, therefore, decline to hold that, as a matter of law, actionable negligence was not shown.

Next, the point is made that the proof did not show how Mr. Lewis fell and hence, necessarily, did not show why he fell, or, at the most, that the facts show equally strong that Mr. Lewis could have fallen from his own negligence as from the negligent condition of this doorway.

There were no known eyewitnesses to Mr. Lewis's fall. His version, the ver-

sion based on the reflection of a seriously injured man, is all we have except the physical surroundings. In Bohn Bros. v. Turner, Tex.Civ.App., 182 S.W.2d 419, 423 (Austin, Writ Ref.W.M.), this court said: "Negligence like any other fact may be proved by circumstantial evidence. * * * Thus the facts and circumstances proved showed a cause from which an accident might occur, and that an accident of that particular character did occur, and in consequence the jury was warranted in inferring that such cause brought about such result."

In amplification of such rule the court in Gulf, C. & S. F. Ry. Co. v. Bouchillon, Tex.Civ.App., 186 S.W.2d 1006, 1008 (Eastland, Writ Ref.W.M.), said: " * * * It is not necessary in such cases that the jury should find the exact manner in which the accident occurred so as to support a reasonable conclusion that there was a causal connection between the negligence found and the collision." See also Burlington-Rock Island R. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723.

■ Mr. Lewis did not know of the immediate step down as he entered the drugstore. He did know that he lost his balance; the door jerked back; his feet slipped and he fell as he went through the door. The sequence in which these happenings occurred is not important. It is a matter of common knowledge that the fall of Mr. Lewis could be attributed to any one or a combination of one or more or all of the negligent and unsafe conditions that constituted this doorway. Proximate cause was, in our opinion, amply substantiated by the evidence.

The alleged contributing negligence of Mr. Lewis is based, primarily, on these three contentions: (1) the failure of Mr. Lewis to see and observe the caution signs on the door; (2) his failure to see the step down and other conditions when the door was opened; and (3) that he stepped "blindly" through the door.

With reference to the signs we have already observed that as Mr. Lewis approached the door he did so facing the light of the garage entrance and that he walked close to the wall in order to avoid passing cars; also, that the door was recessed in the wall 12 to 14 inches. While Mr. Lewis was able to read and write he had never been to school. He was not in the best of health and was enroute to see the doctor when he fell. Under these circumstances it is small wonder that he did not stop and read the caution signs on the door. If a person read all the signs encountered in walking upon and down the streets and in going in and out of public buildings, his progress would be slow indeed. Disregard of flashing electric lights at a railroad crossing is not negligence as a matter of law. Texas & P. Ry. Co. v. Day, 145 Tex. 277, 197 S.W. 2d 332.

In the foregoing part of this opinion we have discussed our view of the manner in which Mr. Lewis entered the drugstore. It is sufficient to say here that only by an unusual, awkward and unnatural entrance into the drugstore would Mr. Lewis have observed the dangers which lay in wait.

We have set out, above, the language of Mr. Lewis when he, twice, used the word "blindly" in describing his fall. As stated, Mr. Lewis was a man with no schooling. His vocabulary was small. Perhaps his choice of words was poor. To us the use of the word "blindly" as made by Mr. Lewis means merely that he couldn't see where he was stepping until it was too late, and not that he closed his eyes and bolted through the door in disregard of his own safety.

■ We believe all of the testimony relied on as showing Mr. Lewis to be guilty of contributory negligence as a matter of law is evidentiary only, and not of such a compelling nature as to force the only reasonable conclusion that he was contributorily negligent. Texas & Pac. Ry. Co. v. Day, supra.

We now come to the most difficult questions in the case, those concerning the respective liabilities and counter liabilities of Renfro, the Bank, and the Motoramp. To

these questions such parties have devoted most of their briefs.

Under the trial court's judgment, and assuming the solvency of the Bank, all of this judgment must be paid by the Bank. The Motoramp, at whose invitation Mr. Lewis first came on the premises, and by whose express invitation Mr. Lewis was invited to use this doorway, has been acquitted all around, even as to Mr. Lewis. Renfro, while technically liable to Mr. Lewis, is practically exonerated by virtue of its judgment over against the Bank. Yet, Renfro, physically speaking, was more closely related to the incident than was the Bank. Mr. Lewis fell in its store.

Before proceeding to discuss the facts upon which the comparative liabilities of the parties with each other must be based, it is necessary to determine their respective liabilities to Mr. Lewis. As to Motoramp this is so, not because non-appealing Mr. Lewis can obtain a judgment against the garage, but because of the Bank's claim of indemnity or contribution from Motoramp.

■ "The proprietor of a place of business which is kept open to public patronage is obligated to keep the approaches and entrances to his store in a reasonably safe condition for the use of customers entering or leaving the premises." 38 Am.Jur., p. 795. See also 30 Tex.Jur., p. 863.

■ In our opinion Motoramp was liable to Mr. Lewis because he failed to provide a safe exit from the premises, which exit Mr. Lewis was expressly invited to use.

■ The liability of Renfro to Mr. Lewis is based upon the same legal principle invoked to establish the liability of Motoramp. The only factual distinction between the Motoramp and Renfro cases being that Mr. Lewis was an express invitee of Motoramp and perhaps only an implied invitee of Renfro, and that Lewis was an actual customer of the garage and only a potential customer of the drugstore. Neither of these differences is substantial as they do not affect the rights and duties of the parties. (1) Texaco Country Club v. Wade, Tex.Civ.App., 163 S.W.2d 219 (Galveston); (2) Carlisle v J. Weingarten, Inc., 137 Tex. 220, 152 S.W.2d 1073.

The liability of the Bank to Lewis depends on facts which are also relevant to the questions of indemnity and contribution arising between the Bank, Renfro and Motoramp, which we will now state:

■ The Bank as landlord made separate leases with its tenants, Renfro and Motoramp. The Renfro lease was made first and contained these provisions:

"The lessor hereby leases, demises, and lets unto lessee, and the lessee hereby hires, approximately one thousand five hundred nineteen square feet (1,519 sq.ft.) of floor space on the west side of the ground floor of the Norwood Building in Austin, Travis County, Texas, with a frontage of approximately thirty feet (30 ft.) on West Seventh Street, being the ground floor space now occupied by the lessee * * *.

\*   \*   \*   \*   \*   \*

"Lessee shall have the right, at its own expense, to make such alterations in and improvements upon the space hereby leased as it may desire to make, provided, however, that before making any such alterations or improvements, lessee shall submit plans and specifications therefore to lessor and shall receive its approval thereof, and provided further that all such improvements and alterations shall belong to lessor.

\*   \*   \*   \*   \*   \*

*"It is agreed and understood that lessee will keep open at all times during the hours that its store is open for business a passageway through the ground floor portion of the leased premises from the Norwood Building into the Motoramp Garage.*

"That lessor will keep the corridors, halls, and entrances leading to lessee's store in good repair.

\*   \*   \*   \*   \*   \*

"It is expressly agreed and understood that lessor shall not be liable to lessee or to any of its customers, officers, agents, or employees for any damage or injury occasioned in or about said building, unless such damage or injury is the direct result of the negligence of lessor, its agents or employees."

The lease between the Bank and Motoramp, made in January 1945, contained these provisions:

"For the consideration above specified * * * lessor * * * lets to the lessee * * *:

\* \* · \* \* \* \*

"One signal system for use by tenants in the Capital National Bank Building (formerly the Norwood Building) to notify the storage office of their desire for service.

\* \* \* \* \* \*

"The lessor shall not be liable to the lessee, his employees, or customers, or to the public generally, for any defect which at the time of the lessee's acceptance of said leased premises exists of which may thereafter develop or exist in said leased premises, nor shall lessor be liable for any injury or damage that may occur from wind, rain, hail, snow, sleet, storm, leaks, breaks, fire, the elements, negligence, or otherwise, and shall in no event be liable for any injury to any person or property in or about the leased premises during the term of this lease.

"The lessee hereby agrees and binds himself to indemnify and save harmless the lessor against any liability or loss for any injury or damage to persons or property occurring on the leased premises, arising out of or resulting from any cause whatsoever; excepting injuries or damages resulting from structural or inherent defects in the building or any cause for which the lessor would be liable.

\* \* \* \* \* \*

"It is further understood and agreed that, during the continuance of this lease, tenants or occupants of the Capital National Bank Building (formerly the Norwood Building) shall not be charged more than Twelve Dollars ($12.00) per month for daily storage of one (1) automobile in the leased premises."

Mr. Edward Joseph of the Motoramp testified that the signal system was for the use of the tenants in the Bank's office building, who wished to notify the garage that a certain car was wanted, and that about 190 tenants of the office building stored their cars in the garage; also that the passageway through the drugstore was used by many of his customers (259 in one day, 8 a. m. to 5 p. m.), who but for its use would have had to go out to the street and down the sidewalk before entrance could be made either to the drugstore or the bank, or the bank's office building.

About a year before Mr. Lewis fell the garage discontinued use of the signal system, and at about the same time Mr. Joseph requested the president of the Bank to close the door between the garage and the drugstore because of his fear that persons coming from the drugstore into the garage would be hit by a car. The request was denied, the president stating that the Bank "had an obligation to the occupants of the building to use the passageway into the Motoramp."

Renfro exercised actual control over the door into the garage, its employees alone having the key and determining when the door should be open and when it should be closed.

We need not determine whether but for the provision in the Renfro lease that a passageway would be kept open between the Motoramp and the Norwood Building, the Bank would be liable to Mr. Lewis under ordinary rules governing the relationship of landlord and tenant. The effect of this provision, insofar as the Bank is concerned, in our opinion, is that Mr. Lewis and the public generally were invitees of the Bank to use this passageway over which it rightly exercised some dominion. The purpose of this reservation was, in part at least, for the peculiar benefit of the Bank, in that it gave its tenants and the public convenient access to and from the elevator lobby of the Bank's building. This reservation by the Bank carried with it the legal measure of responsibility which in this case was of the same character as that imposed upon Renfro and Motoramp, and hence the Bank was liable to Mr. Lewis.

In attempting to shift the burden of this judgment from one to the other, the positions taken by the Bank, Renfro, and the Motoramp briefly are:

The Bank's view is that it is a mere landlord who has parted with possession and control of the premises where Mr. Lewis fell, and that the general rule of non-liability of landlords for defective premises protects it, citing: Perez v. Raybaud, 76

Tex. 191; 13. S.W. 177, 7 L.R.A. 620; Medlin v. Havener, Tex.Civ.App., 98 S.W.2d 863 (Ft. Worth); .Goldstein Hat Mfg. Co. v. Cowen, Tex.Civ.App., 136 S.W.2d 867 (Dallas, Writ Dis.); Hamblen v. Mohr, Tex.Civ.App., 171 S.W.2d 168 (Galveston, Writ Ref. W. M.); Morton v. Burton-Lingo Co., 136 Tex. 263, 150 S.W.2d 239; Flynn v. Pan American Hotel Co., 143 Tex. 219, 183 S.W.2d 446.

Renfro contends that the place where Mr. Lewis fell was not on the premises demised to it or over which it had any control, but was on a passageway reserved by the landlord for the use and benefit of all its tenants and that the landlord alone was liable for the defective condition of this passageway. The principal authority relied on is Paternostro v. Bradley, Tex.Civ.App., 262 S.W. 896 (Dallas).

█ Motoramp, having neither possession of nor control over the passageway and being without power to remedy its defective condition and having failed in its effort to close the door through which Mr. Lewis fell, insists that whatever liability it may have towards Mr. Lewis, it was neither the principal wrongdoer so as to be subject to indemnity, nor was it equally guilty as a joint tort feasor so as to be required to contribute to the payment of the judgment. We agree with Motoramp.

█ As between the Bank, Renfro and Motoramp, the latter was completely without control over the passageway. "Control" is the principal factor in determining who should bear responsibility for defective premises, liability therefor, as a general rule terminating with cessation of control. 38 Am.Jur., p. 753. See Smith v. Henger, Tex. Sup., 226 S.W.2d 425, and authorities there cited.

Control over this passageway was vested in the Bank and Renfro, by contract, and each was duty bound to provide and maintain a reasonably safe passageway. This duty was owed to the public generally, not excluding the garage, its employees and customers. Conversely, Motoramp, who had no say-so in either opening, closing, or maintaining this passage, owed no duty to either Renfro or the Bank in regard thereto.

Under these circumstances, neither Renfro nor the Bank is entitled to indemnity or contribution from Motoramp. Humble Oil & Refining Co. v. Martin, Tex.Sup., 222 S.W. 2d 995.

We are unable to agree with Renfro that this passage was not included within the premises demised to it. The physical facts and the terms of the lease refute this contention. Also untenable is the Renfro claim that it had no control over the passageway. It did not have exclusive control, it is true, but it did have joint control with the Bank. This joint control is established by the lease. The passageway is a contractual creation of both the Bank and Renfro, with the express provision that Renfro could, with the consent of the Bank, make such alteration or improvement on the leased premises that it desired. Renfro and the Bank having, by agreement, opened the passageway, could, by agreement, alter, improve, or close it.

What we have just said disposes of the Bank's contention that it is an ordinary landlord of the tenant Renfro, with exclusive possession and control of the passageway being vested in the tenant.

█ In Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508, 510, the court, with approval, quoted from 38 Am.Jur., Sec. 20, p. 662, the following: "A contract may create the state of things which furnishes the occasion of a tort. The relation which is essential to the existence of the duty to exercise care may arise through an express or implied contract."

█ We believe that the contract between Renfro and the Bank created the state of things out of which arose the joint duty of each to exercise care in performing that which was undertaken. The joint failure to exercise the care required by law has caused injury to Mr. Lewis. This injury was not brought about by any breach of duty which Renfro owed the Bank or the Bank owed Renfro. They were joint tort feasors and each entitled to contribution from the other under the provisions of Art. 2212, Vernon's Ann.Civ.St. Humble Oil & Refining Co. v. Martin, supra.

We have carefully examined all provisions of the lease between the Bank and Renfro and the Motoramp, and we are of the opinion that they do not require any holding contrary to those made herein.

The judgment of the trial court is reformed by eliminating the judgment in favor of Renfro over against the Bank, by way of indemnity, and in lieu therefor it is ordered that Renfro and the Bank are each awarded contribution against the other under the provisions of Art. 2212, V.A.C. S. In all other respects the judgment of the trial court is affirmed.