## FLYNN v. PAN AMERICAN HOTEL CO.
### No. 11395.

Court of Civil Appeals of Texas.
San Antonio.
March 22, 1944.

Rehearing Denied April 19, 1944.

850

Elmer Ware Stahl and A. R. Sohn, both of San Antonio, for appellant.

Johnson & Rogers and Nat L. Hardy, all of San Antonio, for appellee.

NORVELL, Justice.

This is an appeal from a judgment (based upon an instructed verdict) that appellant, Martin Flynn, take nothing against appellee, Pan American Hotel Company.

Viewing the evidence in the light most favorably to appellant, it may be said that Flynn sustained severe bodily injuries which proximately resulted from defects in an elevator or its appliances. The trial court's holding was, in effect, that appellee, Pan American Hotel Company, was not responsible to appellant for the defective condition of said elevator at the time of appellant's injuries. The Pan American Hotel Company is the owner of the St. Anthony Hotel, San Antonio, Texas. The elevator involved is the "back elevator" of said hotel.

Appellant contends here that the trial court erred in this holding, in that (a) appellee had assumed and undertaken the maintenance and repair of the elevator involved and further (b) appellee was liable for appellant's injuries by reason of the Passenger Elevator Act of 1925, Acts 39th Legislature Chapter 29, p. 147. Articles 6145a, 6145b, Vernon's Ann.Civ.Stats., and Article 1661a, Vernon's Ann.Penal Code.

We examine appellant's first contention. Flynn at the time of his injury was an employee of the New St. Anthony Hotel Company, a corporation, being the "back door man" of the St. Anthony Hotel. He went to work at 3 p. m. and remained on duty until about midnight or one o'clock of the following morning. It was his duty to see that the door to the hotel ballroom was locked before he left the hotel. When the elevator here involved, was in position upon the ground floor, the ballroom door could be reached by walking over the floor of the elevator to said door which was situated in the back side of the elevator shaft. This particular elevator was not equipped with interlocking doors, and it was therefore possible for the elevator to move or be moved while the doors or gates thereto were open. The elevator control was also defective in that a spring in the direction switch or lever had been broken and had not been replaced. The purpose of this spring was to keep the direction lever in a neutral position so that the elevator would not move. In order to cause the elevator to ascend or descend, the direction lever would be moved by physical force to the "up" or "down" position.

On February 5, 1937, immediately after he had locked the ballroom door while

standing upon the elevator floor, Flynn started to leave the elevator. He had put one foot upon the landing. The other was still upon the elevator floor when the elevator suddenly dropped and he was caught between the top frame of the elevator and the wall. Flynn was rendered unconscious and suffered severe bodily injuries. The evidence supports the theory that the sudden dropping of the elevator was caused by the direction lever having slipped into the "down" position because of its not being equipped with a proper spring. This caused the elevator to descend as it was not equipped with interlocking doors, as heretofore pointed out.

By reason of his injuries, Flynn was paid workman's compensation as an employee of the New St. Anthony Hotel Company. This is a common law negligence action against appellee, Pan American Hotel Company, and Flynn in his pleadings recognized the right of the workmen's compensation insurance carrier to subrogation up to the amount paid to him as workman's compensation.

Appellee, Pan American Hotel Company, is a corporation, and is the owner of the building, furnishings and equipment of the St. Anthony Hotel. The evidence indicates that substantially all of the stock of the New St. Anthony Hotel Company, also a corporation, is owned by the Pan American Hotel Company. It may be said that the Pan American is a holding company, while the New St. Anthony is an operating company.

Appellant recognizes the separate corporate identities of the two business organizations and also that the relationship of landlord and tenant existed between them. The lease contract in force at the time Flynn was injured, between the Pan American as lessor and the New St. Anthony as lessee, was introduced in evidence.

As to repairs the written lease stipulated that:

"It is mutually understood and agreed that said property is to be operated and used as a hotel, and lessee hereby covenants and agrees to keep and maintain the same in good condition and good state of repair, both as to the building premises and the furniture and fixtures therein, throughout the full term hereof, and to redeliver the same unto the lessor, its successors or assigns, upon the termination of this lease so that the appearance or operating efficiency of the hotel and/or its equipment, furniture or appurtenances is unimpaired, * * *."

We pause here to state that it is well settled in this State that:

"Where there is no agreement by the landlord to repair the demised premises and he is not guilty of any fraud or concealment by failing to disclose hidden defects of which he has knowledge, the tenant takes the risk of their safety and the landlord is not liable to him or to any person entering under his title or by his invitation for injury caused by reason of their unsafe condition." Yarbrough v. Booher, Tex., 174 S.W.2d 47, 48, quoting from Morton v. Burton-Lingo Co., 136 Tex. 263, 150 S.W.2d 239.

Here we have an express covenant to repair which is the obligation of the New St. Anthony. Flynn, as an employee of said corporation, was on and about the premises under the title of the lessee. In the absence of a showing of something further, the Pan American undoubtedly would not be liable for Flynn's injuries.

However, the lease here involved contained a further clause relating to rental to be paid by lessee to lessor, which obligated the New St. Anthony, as lessee, to pay to the Pan American, as lessor, "an amount equivalent to ten (10%) per cent each year on any and all advances made and expenses incurred by lessor for the purpose of improving and/or reconditioning the property and premises covered by this lease, the amount of which advances and expenses are to be ascertained by a statement of accounts furnished by lessor to lessee on the first of November, 1935, and thereafter additional advances and expenses so incurred shall be shown by monthly statements furnished by lessor to lessee. The rental amount equivalent to 10% each year on such advances is due and payable in equal monthly installments on the first day of each month during the term of this lease after the amount of such advances and expenses have been fixed as above provided, and in addition to the above stated rental amounts lessee agrees to pay as additional rental * * *."

It is appellant's contention that, notwithstanding the express provision in the lease whereby the New St. Anthony obligated itself to maintain the property in a good state of repair, the Pan American became liable for defects in the premises and equipment of the hotel by reason of having actually

made repairs and assumed an obligation relating thereto.

The evidence does show that appellee expended large sums of money in remodeling, renovating and repairing the building and equipment used in the operation of the St. Anthony Hotel. It further shows that Pan American had paid for the installation of a new motor for the back elevator and made other replacements or repairs in connection therewith. However, there is nothing in the record to indicate that the replacements installed or the repairs made in connection with the elevator, by appellee, were defective in any way. It is not contended that the failure of a repair or replacement actually made by Pan American contributed to appellant's injury.

As to the two defects of the elevator complained of, the lack of interlocking doors and the broken spring of the direction lever, the evidence shows that a dispute took place between Paul McSween, President of the New St. Anthony and R. H. Morris, President of Pan American. McSween contended that the cost of these repairs or installations should be paid for by Pan American and the cost thereof charged to a capital expenditure by Pan American to be paid back by New St. Anthony under the clause relating to rentals at the rate of ten per cent per year. Morris, on the other hand, contended that this particular cost was an operating cost for which the New St. Anthony was liable under its covenant to keep the premises in repair, and, consequently, such expenditures should be charged direct to the New St. Anthony as an operating expense. The result was that Pan American refused to make these repairs and installations on the elevator involved.

■ As to the construction of the written lease here involved, we hold that the primary obligation to maintain the demised premises and property in a good condition and good state of repair rested upon the New St. Anthony. The written instrument plainly so provides. As to that part of the rental clause relating to the improving or reconditioning of the property, it was obviously understood by the parties, that the advances of money for reconditioning or repairing purposes was optional with the Pan American. While it might be supposed that minor repairs would be paid for by the New St. Anthony as an operating expense, and major renovations or installations, such as the construction of additions to the hotel,

etc., would be paid by Pan American and charged back to the New St. Anthony in accordance with the rental clause, the terms of the lease itself provide no standard by which it may be determined whether the repair or replacement is major or minor. In fact the lease contains no criterion which would determine whether a particular, repair should be charged direct to operation expenses of the New St. Anthony or to a capital expenditure of the Pan American. This necessarily left the matter optional with Pan American. It could make such repairs and installations as it desired and charge the same to the New St. Anthony under the terms of the rental clause, but if it did not desire to do so, and the particular repair or installation was one which came within the provisions of the repair clause of the lease, the obligation to make the same rested upon the New St. Anthony as an expense of operation.

■ In order to recover upon the particular theory now being discussed, it was the burden of appellant to show that the lease provision as to the duty of repairing was in effect a sham or subterfuge, and that in fact the true agreement between the lessor and the lessee was one which obligated the landlord to maintain the "back elevator" in a good state of repair. The evidence indicates that the Pan American at all times dealt with the New St. Anthony in accordance with the provisions of the written lease. There is no evidence which would support a hypothesis that the Pan American, or the New St. Anthony for that matter, regarded the "repair clause" of the lease as being a sham, or that these corporations were acting under some understanding or contractual arrangement other than that expressed in the lease itself. Texas Company v. Wheat, 140 Tex. 468, 168 S.W. 2d 632.

■ Appellant complains of the action of the trial court in excluding from evidence a certain insurance policy issued by the Aetna Casualty and Surety Company to "Pan American Hotel Company and New St. Anthony Hotel Company operating as The St. Anthony and New St. Anthony Hotel Company operating as 'The St. Anthony Hotel Drug Store'." This policy is designated as a Comprehensive General Liability Policy." Several elevators are listed in the "General Liability Schedule" of the policy, including the one here involved. In the printed form of the policy under "Conditions," it is provided that the

word "contract" as used in the policy shall mean if in writing, "a lease of the premises, easement agreement, agreement required by municipal ordinance, sidewalk agreement or elevator or escalator maintenance agreement." The mention of an elevator or escalator agreement by way of definition of the term "contract" in the insurance policy issued jointly to Pan American and New St. Anthony is not evidence of an agreement whereby Pan American undertook and agreed to keep the elevators of the St. Anthony Hotel in a state of good repair. The trial court properly excluded the insurance policy from evidence. However, if it be considered, it would in no wise disturb the holdings herein set forth.

■ We next consider the asserted liability of Pan American by reason of the Passenger Elevator Act of 1925. Sections Nos. 1 and 2 of the Act were designated as Articles 6145a and 6145b of Vernon's Ann. Civ.Stats., and Section 3 was designated as Article 1661a of Vernon's Ann.Penal Code, by the publishers of said Civil Statutes and Penal Code. The Act reads as follows:

"Safeguarding All Passenger Elevators Within the State of Texas.

"H. B. No. 217. Chapter 29.

"An Act to protect life and limb by requiring safeguarding of all passenger elevators within the State of Texas, providing for approval of safety devices and fixing a penalty, and declaring an emergency.

"Be it enacted by the Legislature of the State of Texas:

"Section 1. It shall be unlawful, after the 1st day of January, 1926, to operate passenger elevators for the carriage of passengers in any building within this State, until the same shall be equipped with a device that will prevent moving said elevator when the gate or door thereto is open; provided, however, that the installation of any such device, the design of which shall have been approved either by the United States Bureau of Standards, or by the Industrial Accident Board of the State of Texas, shall be prima facie evidence of a compliance with this Act.

"Sec. 2. It is hereby made the duty of the Industrial Accident Board to inspect and approve or disapprove the model, drawing, or design of any such devices as may be submitted to it in Austin, Texas, and to charge therefor a fee of $10.00.

"Sec. 3. Any person, or the members of any partnership, owning, leasing or in charge or control of any building or edifice operating passenger elevators, and the board of directors, president, general manager, or other agent or employe of any corporation, or any trustee or receiver of such corporation, which is the owner, lessee, or in charge of any such building or edifice operating passenger elevators therein, who shall violate the provisions of this Act shall each be guilty of a misdemeanor, and upon conviction shall be fined not less than five ($5) dollars nor more than twenty-five ($25), and each day such elevator is operated without such device shall constitute a separate offense.

"The fact that there is now no adequate law in this State covering this subject, and the loss of life is occurring daily because of such lack, creates an emergency and an imperative public necessity that the constitutional rule requiring all bills to be read on three several days be suspended, and the same is hereby suspended, and this Act shall take effect and be in force, as set out in its provisions, from and after its passage, and it so enacted." (Acts 39th Leg. Reg. Sess. p. 147.)

It appears that the "back elevator" here involved was originally and primarily designed for a freight elevator. It did not connect with or open into the hotel lobby. Several other elevators did open into the lobby situated in the forepart of the hotel and these were generally used by the paying guests of the hotel. After the New St. Anthony acquired a lease of the premises from Pan American it permitted its employees, as well as guests of the hotel to make use of the "back elevator" for the purpose of going from one floor to another in the hotel. Apparently this elevator was convenient for the use of hotel guests arriving by automobile, as they could go direct from their automobiles to their hotel rooms without going through the lobby of the hotel. An employee of the New St. Anthony was on duty at least part of the day as an operator of this back elevator.

Upon analysis of the Passenger Elevator Act, it will be seen that the statute is prohibitory in form and declares it unlawful "to *operate* passenger elevators for the carriage of passengers in any building within this State, until the same shall be equipped with a device that will prevent moving said elevator when the gate or door thereto is open; * * *." Sec. 1.

There is some discussion in the briefs as to whether or not the elevator here in-

volved can be properly classified as a "passenger elevator for the carriage of passengers." It is also pointed out that Flynn at the time of his injury was not using the elevator for its intended purpose—transportation from one floor to another, but, on the contrary, he was using the elevator floor as a platform so that he could reach and lock the door to the hotel ballroom. These matters are not regarded as controlling. Appellant's evidence seeking to show that the elevator involved should be properly classified as a "passenger elevator for the carriage of passengers," does not relate to the design or structure of the elevator, but consists of testimony relating to the actual use thereof for the carriage of passengers. It may be considered that this elevator was a "passenger elevator for the carriage of passengers" and that the "operator" thereof breached a legal duty which it owed to Flynn while he was making use of the elevator in the manner detailed immediately prior to his injury, still no liability on the part of Pan American is established, as the evidence wholly fails to show that Pan American was *operating* the elevator. The operator within the meaning of the statute was the New St. Anthony Hotel Company, the lessee of Pan American.

Appellant cites a number of cases involving *mandatory* statutory provisions relating to safety devices. Examples are: Yall v. Snow, 201 Mo. 511, 100 S.W. 1, 10 L.R.A., N.S., 177, 119 Am.St.Rep. 781 (a fire escape case), and Tvedt v. Wheeler, 70 Minn. 161, 72 N.W. 1062 (an elevator case). These cases recognize that the state statutes involved place an additional legal liability upon the owner of a building—one not in existence under the common law. The statutes contain the measure of this additional liability. The matter is purely one of statutory construction. The Texas statute here involved is prohibitory rather than mandatory. It does not command that all elevators be equipped with interlocking doors, but merely prohibits the operation of "passenger elevators for the carriage of passengers" not so equipped.

Appellant places emphasis upon that part of Section 3 of the Act which, insofar as it relates to corporations, provides that "the board of directors, president, general manager, or other agent or employe of any corporation, * * * which is the owner, lessee, or in charge of any such building or edifice operating passenger elevators there-

in, *who shall violate the provisions of this Act* shall each be guilty of a misdemeanor, * * *." The *provisions* referred to in Section 3 are those contained in Section 1, wherein that which is characterized as unlawful is distinctly specified to-wit: the *operation* of passenger elevators for the carriage of passengers when such elevators are not equipped with interlocking doors.

It can not be said that Pan American violated the Texas statute by merely owning a building in which was situated an elevator not equipped with interlocking doors. Further, had the use of this elevator been restricted to the transportation of freight or merchandise, there would be no grounds for contending that the statute had been violated. The contention that the statute was violated is based upon the use to which the elevator was put. This use resulted from the actions of the New St. Anthony and not from the actions of the Pan American.

Our conclusion is that the trial court properly instructed the jury to return a verdict for appellee. Perez v. Rabaud, 76 Tex. 191, 13 S.W. 177, 7 L.R.A. 620; Oriental Inv. Co. v. Sline, 17 Tex.Civ.App. 692, 41 S.W. 130.

The judgment is affirmed.