CLARENCE QUIST, APPELLEE, V. WALTER DUDA ET AL.,
APPELLANTS, IMPLEADED WITH EASY PARKING
COMPANY, A CORPORATION, APPELLEE.
67 N. W. 2d 481

Filed December 10, 1954.   No. 33535.

*Gross, Welch, Vinardi & Kauffman* and *Swarr, May, Royce, Smith & Story,* for appellants.

*Robinson, Hruska, Crawford, Garvey & Nye,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action in which plaintiff, an employee of a tenant, seeks to recover from the landlord damages in tort for injuries received in a man-lift in a garage. The tenant was made a party defendant for the purposes of subrogation because of workmen's compensation that had been paid. Issues were made and trial had. At the close of plaintiff's case-in-chief, the landlord defendants made a motion for a directed verdict or a dismissal. The trial court sustained the motion and dismissed the cause.

Plaintiff and defendants' tenant moved for a new trial. The trial court sustained the motion. The landlord defendants appeal.

We reverse the judgment of the trial court and remand the cause with directions to reinstate the judgment of dismissal.

The action is one essentially between the plaintiff and the defendants Duda, the owners of the property. We will hereinafter refer to defendants, meaning the property owners.

The defendants became the owners of the property involved on September 1, 1943, and continued to be the owners thereof until the date of this accident on October 25, 1948. Apparently the tenant was then in the building and continued to occupy the property under succeeding leases.

The building involved is a combination office and garage building. The garage, used in large part for storage and parking of automobiles, occupied parts of

the first six floors. Serving these six floors, was a man-lift or elevator consisting of an endless belt upon which steps were placed which enabled persons to ride up to or down to any of the six floors in question.

The construction of the building was completed before 1930. The date of the installation of the man-lift is not shown, but it is inferable that it was installed about the time of the construction of the building.

The belt operated over large drums or pulleys at the top and bottom. The man-lift operated by an electric motor which was mounted on the ceiling of the sixth floor.

Attached to the mechanism on the sixth floor was a rod extending downward into the fifth floor area where a rope was attached which then followed around the belt on all floors. Going up, a pull on this rod or rope would stop the man-lift; going down, a pull down would stop it. The rod controlled the switch.

On the sixth floor level, built into the mechanism of the man-lift, was a safety device that would stop the man-lift at any time a person was standing on a man-lift step when it reached that floor. When this device was installed is not shown. It was made to connect with the rod above mentioned. This floor device had been disconnected so that it no longer functioned. The parts were attached, but it was not used as a safety device. When it was disconnected does not appear, but it "hadn't been used for a long time." No witness testified to any time when it was so used. The reason it was disconnected is not shown. However, it does appear that the tenant, for efficiency reasons, desired continuous operation of the man-lift and there was less wear and tear by constant operation than if shut off and turned on every time a man used it.

There was another safety device built and attached to the rod above described. This, although called a "U" shaped device, actually is in the shape of three sides of a rectangle. It was built of iron pipe and

placed near the ceiling of the sixth floor, and parallel with the floor. It was large enough to permit the steps to go through it. It was connected at one side to the rod, above described, and the other side had a down rod that floated in a sleeve. This U device was designed to throw the switch and stop the man-lift when pressure upwards was exerted on it.

So far as this device is concerned, it is shown to have served the purpose intended. There is, however, the testimony of an employee of the tenant who, a year and a half before the accident, tested the U device and found that when pushing up on the end that floated, it would not stop the man-lift. He never tested it again and did not report it to anyone. He continued to use the man-lift. When this U-shaped device was installed is not shown.

Plaintiff went to work for the tenant about 16 months before the accident. His duties were largely to drive cars to and from the various floors. He was shown how to ride the man-lift. He would be on the man-lift as many as 200 times a day. He knew about the rope and rod and that he could start and stop the man-lift with it. He had done it many times. He had been to the sixth floor on the morning of the accident, had gotten off each time, and the man-lift was working smoothly. About noon of the day of the accident, he rode the man-lift to the sixth floor. He did not get off. He rode the man-lift two or three feet above the sixth floor when the U device hit him behind the shoulder. A part of his body was in the loop. He tried to jump, but was caught. He testified that the belt did not stop. At another place, he testified that the mechanism did not stop.

From the testimony of other witnesses, it appears that the drum kept turning but the belt stopped with a step holding plaintiff against the ceiling. The pulley was burning the belt.

The defendants maintained a full-time engineer on the premises. It is shown that he inspected the man-

lift daily and thoroughly once a week. He knew about the safety devices above set out. It also appears that whenever repairs were needed, and they were called to the attention of the defendants' employees, that the work was promptly done. It does not appear that at any time were they requested to make any changes in the devices herein described.

That the plaintiff suffered serious injuries is not questioned. The question presented here is that of the liability of the landlord to the employee of the tenant.

We are urged to state a common-law rule holding that where a landlord contracts to keep leased premises in repair, a legal duty to perform the contract arises, and that a negligent performance of that duty, resulting in injuries to a person lawfully on the premises, renders the landlord liable to respond in damages. Plaintiff asserts that we adopted that rule in Fried v. Buhrmann, 128 Neb. 590, 259 N. W. 512. That case had in it, and turned on, the element of a warranty as to safety and fitness.

Defendants contend that the rule is a minority rule and should not be followed since one should not be subjected to a liability for a tort by reason of a breach of contract.

The opposing rules are discussed in Van Avery v. Platte Valley Land & Investment Co., 133 Neb. 314, 275 N. W. 288. The decision ultimately turned on the failure of the plaintiff to plead and prove the facts which conditioned the applicability of the rule urged. We did not there decide which of the two rules would be followed.

The rule urged here by plaintiff is bottomed on the existence of a contract to repair. The contract defines the extent of the duty. We have held: "In the absence of an express covenant or stipulation a lessor is not bound to make repairs to leased property." Bartholomew v. Skelly Oil Co., 144 Neb. 51, 12 N. W. 2d 122.

Our first inquiry, then, is: What was the contract of the defendants?

The lease, under which the tenant was holding at the time of this accident, was made July 1, 1948. It provided: "That the Lessee, as part of this leasing, and for the consideration herein expressed, shall have the use of all the equipment now being used in the operation of said garage; and fire and theft insurance shall be carried thereon for benefit of Lessor, and Lessee shall be liable for damage and injury to same and for losses of same, reasonable wear and tear excepted." (Exhibit 1, par. 9(F).)

"That it will surrender the premises at the expiration of the term of this lease, or at the end of such term to which the lease may be extended, in like order and condition as when taking possession thereof, ordinary wear and tear and casualties by fire, the elements, act of God, or the public enemies or from other causes beyond its control excepted; and shall fix and repair any and all damages and injury caused by its removal." (Exhibit 1, par. 5.)

"That the Lessee * * * shall make no alterations, additions or improvements without the written consent of the Lessor * * *." (Exhibit 1, par. 8.)

"That the Lessor will keep the building in good repair and condition, including, but not by way of limitation, sidewalks, driveways, etc., and shall also keep in repair the heating and plumbing plants and equipments in said demised premises, and that the Lessee shall make only such repairs as are made necessary by the regular operation of its business as distinguished from repairs that are made necessary by reason of damage by the elements, deterioration from age, or from ordinary wear and tear, and Lessee shall fix up and repair all damages and injuries caused by it, its business and its imployees (sic)." (Exhibit 1, par. 9(C).)

"That the Lessor or its representatives may enter said premises at any reasonable hour to make necessary re-

pairs upon said premises, and to protect the same against the elements, or accidents, or to make any inspections or examinations which it may desire to make." (Exhibit 1, par. 7.)

The man-lift may properly be considered as an equipment "now being used in the operation of said garage," which the tenant agreed to surrender at the end of the term "in like order and condition as when taking possession thereof" (subject to the exceptions above stated), and that the tenant was to make "no alterations, additions or improvements" thereto without the written consent of the defendants.

The man-lift was also equipment which the defendants covenanted to "keep in repair," subject again to the conditions stated. To enable the defendants to comply therewith, they had the right to "enter said premises at any reasonable hour to make necessary repairs."

What, then, is included in defendants' covenant to "keep in repair"?

In Brown County v. Keya Paha County, 88 Neb. 117, 129 N. W. 250, Ann. Cas. 1912B 790, we held: "The word 'repair' means to restore to a sound or good state after decay, injury, dilapidation, or partial destruction." This was followed in Olson v. County of Wayne, 157 Neb. 213, 59 N. W. 2d 400.

In Neumann v. Knox, 115 Neb. 679, 214 N. W. 290, we held that the altering and remodeling of an electric light plant was an improvement. In Watson Bros. Realty Co. v. County of Douglas, 149 Neb. 799, 32 N. W. 2d 763, we accepted a definition of improvements which included "the making of substantial additions or changes in existing buildings."

This distinction is well pointed out in Garland v. Samson, 237 F. 31, wherein it was held that the term "improvement" is a much broader one than that of "repair"; that the construction of new fire protection is not included in the term "repairs," but if such protection is permanently added to the real estate it is an im-

provement. In Columbus Gas & Fuel Co. v. City of Columbus, 17 F. 2d 630, it was held that collar leak clamps put on gas mains were an improvement and betterment and not a repair.

In Kingsted v. Wright County Co-op. Co., 116 Minn. 131, 133 N. W. 399, it was held that a covenant in a lease, obligating the lessor to keep the premises in good repair, did not impose upon the lessor a duty to make improvements or betterments.

In St. Joseph & St. L. R. R. Co. v. St. Louis I. M. & S. Ry. Co., 135 Mo. 173, 36 S. W. 602, 33 L. R. A. 607, it was held that a covenant to keep leased premises in repair imposes the obligation to keep the premises in as good repair as when the agreement was made. Covenants to keep premises in repair and to keep in as good repair as they now are amount to the same thing in law. In Taylor v. Gunn, 190 Tenn. 45, 227 S. W. 2d 52, it was held that a covenant to keep in repair imposes an obligation merely to keep the premises in as good repair as they were when the agreement was made.

Heretofore, we have set out the evidence as to the safety devices on the man-lift.

As to the matters hereinbefore discussed, the negligence charged to the defendants was in permitting the man-lift to be used when they knew or should have known that the safety devices were not in operation and were in a dangerous condition; in having the U device on the sixth floor in such a position that by the time it was realized it was not in operation it was too late to avoid injury; in using a guard gate (the U device) which would permit the passage of a man's body without tripping the automatic shut-off device; and in failing to have a device on the man-lift that would automatically apply a positive brake in case an employee failed to alight at the sixth floor. These do not fall in the classification of "repairs that are made necessary by reason of damage by the elements, deterioration from age, or from ordinary wear and tear." It is clear that the plain-

tiff seeks here to hold defendants, not for failure to make repairs, but for failure to make betterments and improvements on the demised premises. The defendants did not covenant to make such betterments.

Plaintiff also charged negligence, and argues here that the defendants were negligent in that they failed to have the floors, through which the man-lift passed, numbered as a warning of approach to the sixth or top floor; failed to have any conspicuous signs or signal warnings on the sixth floor; and failed to post conspicuous signs carrying instructions on the use of the man-lift. It is quite apparent from what has been said above that there was no covenant on the part of the defendants to do these things. They are charges of failure to make improvements rather than repairs.

It is also charged that the defendants were negligent in not giving proper instructions to persons using the man-lift. No obligation of the defendants is shown to do that insofar as the tenant's employees are concerned.

Testing the allegations of negligence, so far as a common-law liability is concerned, we conclude that they do not fall within the contract duty of the defendants to repair. We need not and do not determine whether or not the so-called majority or minority rule is applicable in this state.

Plaintiff alleged negligence of the defendants in that they failed to observe the statutes as to safety and the safety code for elevators and man-lifts of the Nebraska Department of Labor. He urges here three acts of negligence which he contends fall within that classification. They are that defendants failed to have any conspicuous signs or sound signals warning of reaching the sixth floor landing; failed to have a device which would automatically apply a positive brake in case an employee failed to alight at the top landing; and failed to post conspicuous signs carrying instructions in use of the man-lift.

Plaintiff offered in evidence provisions of the safety

code which he alleges were "enacted" by the Department of Labor pursuant to section 48-412, R. R. S. 1943.

For reasons hereinafter appearing, we do not deem it necessary to determine whether or not the safety code was adopted within the scope of delegated powers as set out in Lennox v. Housing Authority of City of Omaha, 137 Neb. 582, 290 N. W. 451; nor do we deem it necessary to decide whether or not the determination of a class upon whom the code shall operate can be delegated to an administrative body. We are cited to no provision of the safety code that undertakes to define to whom it applies. The provisions relied on here are directed to duties to be performed.

The controlling question here is whether or not the safety code and the statutes regarding safety regulations apply to these defendants, landlords.

The act authorizing the Department of Labor to adopt codes relating to safety appliances was enacted in 1929 as an amendment to section 7693, Comp. St. 1922, which then read: "All safety appliances prescribed by this article shall be subject to the approval of the department of labor." Laws 1929, c. 138, § 1, p. 492. That language was not changed—the amendments were added as sub-paragraphs to the existing statute.

The 1929 act refers to "all employments and places of employment" and the "safety of all persons employed therein and frequenting the same, as the nature of the employment will reasonably permit." It provided for "commissions composed of employers, employees, and such other persons as the Department may designate, * * *." It refers to the duty of the department to make periodic inspections of all places of employment, and to "any employer or employee who uses or operates, * * *." Laws 1929, c. 138, § 1, pp. 492, 493. These are words which ordinarily refer to the relation of master and servant. That relationship does not exist here between the plaintiff and these defendants.

Section 7693, Comp. St. 1922, was enacted as a part of

the civil administrative code in 1919 under the general title of Health and Safety Regulations. See Laws 1919, c. 190, tit. IV, art. 4, p. 558. As amended the 1919 act now appears as sections 48-401 to 48-411 and sections 48-417 to 48-424, R. R. S. 1943. The 1929 act now appears as sections 48-412 to 48-416, R. R. S. 1943.

The prior safety act was contained in Rev. St. 1913, at sections 3588 to 3601, and was originally enacted in Laws 1911, c. 67, p. 299, and Laws 1913, c. 103, p. 258. Those provisions were repealed when the 1919 code was enacted. Laws 1919, c. 190, p. 862.

The 1919 enactment was in effect a re-adoption of the 1911 act with amendments. Where reference is hereafter made to sections in the 1919 act, it applies to the sections in title IV, article 4, thereof dealing with health and safety regulations.

We are concerned with those amendments, for the answer to our problem is found there.

Section 2 of the 1911 act, now section 48-402, R. R. S. 1943, provides for the furnishing of dressing rooms. This section contained a provision which by the 1943 revision was made applicable to sections 48-401 to 48-424. It is: "It shall be the duty of every occupant, whether owner or lessee * * * to make all the changes and additions thereto." In case changes were made on order of the department, it purported to give the lessee a cause of action against "any person, corporation or partnership having an interest" in the premises to recover such proportion of the expenses of making the charge as are adjudged to be fair and equitable.

Prior to the enactment of these provisions we had accepted the following as a definition of the word occupant: "One who occupies; an inhabitant; especially, one in actual possession, as a tenant, who has actual possession, in distinction from the landlord, who has legal or constructive possession." Parsons v. Prudential Real Estate Co., 86 Neb. 271, 125 N. W. 521, 44 L. R. A. N. S. 666.

Section 5 of the 1911 act became section 5 of the 1919 act and, so far as this reference is concerned, is now section 48-405, R. R. S. 1943. It begins: "All persons, companies or corporations operating any factory or workshop * * *." That language was not changed.

Section 7 of the 1911 act began: "It shall be the duty of any person, * * * operating any such factory or workshop * * *." This language was deleted in the 1919 act, section 7, and is not in the present act. (See § 48-407, R. S. 1943.)

Section 9 of the 1911 act began: "It shall be the duty of any person, * * * operating * * *." This was changed in section 9 of the 1919 act to: "Every person operating * * *" and as such remains in section 48-409, R. R. S. 1943.

The word operator generally relates to the person actively and directly engaged in an operation. Deep Vein Coal Co. v. Rainey, 62 Ind. App. 608, 112 N. E. 392; Flynn v. Pan American Hotel Co. (Tex. Civ. App.), 179 S. W. 2d 849, and same case 143 Tex. 219, 183 S. W. 2d 446.

Section 10 of the 1911 act began: "It shall be the duty of the owners or superintendents of all factories, workshops, * * * to report * * *" all fatal accidents and serious injuries. This was changed in the 1919 act, section 17, to: "Every person operating a plant * * *" and as such is now section 48-421, R. R. S. 1943.

Section 12 of the 1911 act provided a right of action to an injured party or his heirs for damages occasioned by any violations. It further provided: "The fact that any employe, servant or other person shall continue to work during the time such owner has failed to comply with the provisions of this act shall not be considered as an assumption of the risk of such employment by such employe, servant or other person and shall not in any case bar recovery of damages for the failure of such owner to comply with the provisions of this act. In all actions brought to recover damages for injuries caused by failure to comply with the terms and provi-

sions of this act the owner, shall in all cases be liable in damages for all injuries caused through a failure to comply with this act. The owner shall in all cases be held liable for the failure or neglect of any superintendent, foreman, or other agent, employed by them, or either of them, to comply with the provisions of this act."

That section was repealed in 1919, and in section 18 of the 1919 act it was provided that: "Every person operating a plant where machinery is used * * *" shall be liable in damages for violations of any provision of the act. This is now section 48-422, R. R. S. 1943.

Section 19 of the 1919 act provided that: "The continuance by any person in the employ of any such operator shall not be deemed an assumption of the risk of such employment." This is now section 48-423, R. R. S. 1943.

It will be noted that the 1919 act specifically repealed and did not re-enact the provisions of the 1911 act which undertook to make the owner liable and by other amendments clearly limited the applicability of the act to "occupants" and "operators."

Two other changes in the 1911 act should be noted which relate to the above conclusion. Section 13 of the 1911 act provided for prosecution for failure to comply with the act and for warrants directed "to the owner, manager or director, in such factory or workshop, * .* *," and section 14 of the 1911 act began: "Any owner, lessee, * * *" in the penalty provision of the act. These two provisions were repealed and section 20 of the 1919 act provided for penalties against "Every person who shall violate any of the provisions of this article * * *." This is now section 48-424, R. R. S. 1943.

It is quite apparent that the Legislature specifically intended to relieve the landlord, who was not occupant or operator, from the class upon whom the Legislature placed the duty of complying with the safety regulations set out in the act.

This conclusion is fortified by our decision involving Chapter 65, Laws 1911. That act in section 10 contained a provision for prosecution, and section 11 contained a right-of-action clause, a nonassumption-of-risk clause, and again three references to the "owner." Those provisions were likewise repealed and a short violation clause was enacted (Laws 1919, c. 190, tit. IV, art. 4, §§ 30, 31, p. 566), which is now section 48-434, R. R. S. 1943, and a nonassumption-of-risk provision was enacted which is now section 48-435, R. R. S. 1943. We had Chapter 65, Laws 1911, before us for construction in Butera v. Mardis Co., 99 Neb. 815, 157 N. W. 1024, decided in May 1916. That was an action against an owner of a lot and a building contractor. The action involved an employee of the contractor. We held that the act was constitutional insofar as it made liable the owner of the lot on which the building was being erected. We were also urged to construe the word "owner" as to apply to the building contractor and not the owner of the real estate. We held that the owner of the real estate was included in the clauses involved. The amendments to which we refer obviously nullified the statutory foundation of the holding in the Butera case.

Tralle v. Hartman Furniture & Carpet Co., 116 Neb. 418, 217 N. W. 952, is not controlling here. It involved a one-sentence ordinance where the persons liable for nonperformance were not defined. There the landlord undertook to escape liability by contending that he was an employer under the compensation act. The questions here determined were not presented there.

It necessarily follows that there is neither statutory nor common-law liability shown against these defendants. The judgment of dismissal was correct. The judgment granting a new trial was error.

This conclusion makes unnecessary a determination of the presented questions of negligence, proximate cause, and contributory negligence.

The judgment of the district court is reversed and the

cause remanded with directions to set aside the order granting a new trial and to reinstate the judgment of dismissal.

REVERSED AND REMANDED WITH DIRECTIONS.