EARL FOSLER, A MINOR, BY CHESTER FOSLER, HIS FATHER, NATURAL GUARDIAN, AND NEXT FRIEND, APPELLANT, V. ARTHUR ADEN ET AL., APPELLEES.

122 N. W. 2d 494

Filed July 5, 1963. No. 35452.

Ivan A. Blevens, for appellant.

John E. Dougherty, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action at law brought by Earl Fosler, a minor, by Chester Fosler, his father, natural guardian, and next friend, against Arthur Aden and the Farmers Union Cooperative Association, a corporation, defendants, to recover damages under section 48-422, R. R. S. 1943, resulting from loss of a foot which was amputated by a grain auger alleged to have been improperly protected by guards in violation of section 48-409, R. R. S. 1943. The employer of the minor plaintiff, Farmers Union Cooperative Association, a corporation, hereinafter called corporation, was joined as defendant for the purpose of subrogation under the Nebraska Workmen's Compensation Act. The trial court rendered judgment in favor of the defendant Aden and against the plaintiff Earl Fosler, in that such plaintiff had no cause of action against the defendant Aden. The plaintiff filed a motion for new trial which was overruled. The plaintiff perfected appeal to this court.

The plaintiff's petition alleged in substance that Earl Fosler was a minor, 18 years of age, and brought this action against Arthur Aden as operator of an elevator or plant; that Arthur Aden willfully, deliberately, and intentionally installed and operated therein a machine shafting with grain auger blades affixed thereto, without providing guards, boxing, screens, or other appliances as would protect employees against injury therefrom, in violation of the provisions of section 48-409, R. R. S. 1943; that on July 26, 1961, Earl Fosler was employed by the corporation in the plant operated by Arthur Aden, on which date he was ordered and directed by Arthur Aden to enter the grain pit where the

auger shafting was turning and being operated in violation of the Nebraska Safety Code, which auger shafting was located in a depression in the floor of the pit on which it was necessary for employees to walk; that while Earl Fosler was executing the directions given by Arthur Aden his foot slipped in the shafting and his right leg was amputated and cut off between the knee and the ankle; and that as a direct and proximate result of the injury he suffered pain, was required to employ surgeons, was hospitalized, was permanently disabled, and has been damaged, for which he prayed judgment.

The defendants' answer, as far as necessary to consider, admitted the identity of the corporation with its principal place of business in Milford, and denied all other allegations of the plaintiff's petition. The answer alleged that Arthur Aden and Earl Fosler were co-employees of the corporation and were covered under the Nebraska Workmen's Compensation Act; and prayed that the plaintiff's petition be dismissed.

For convenience we will refer to Earl Fosler as the plaintiff, to Arthur Aden as the defendant, and to other witnesses by their names.

Chester Fosler testified that he was the plaintiff's father; that the plaintiff was living with the family on July 26, 1961; that the plaintiff had spent 1 year at the University of Nebraska taking a pre-engineering course; and that the plaintiff obtained employment at the corporation's elevator in Milford in July 1961. This witness was the secretary of the board of directors of the corporation, hereafter referred to as the board, at the time of the accident. The plaintiff's employment was considered by the board and he was employed, to be paid $1.25 an hour. His hours of work were varied. This witness further testified that he had been a stockholder in the corporation for a number of years; that the corporation had a general manager at its elevator who received a regular salary as manager and a commission based on the earnings of the corporation; that the de-

fendant had been the manager of the elevator for 16 or 17 years; that the board met once a month and at times had special meetings; that there were seven members of the board; that the meetings were usually held in the evening and the manager was generally present to make a report to the board which consisted of the total dollar business, cash business, accounts receivable, and cash value of all grain sold; that the manager had charge of the elevator and hired the employees but they had to be approved by the board, at least for full-time help; that the board fixed the salaries; that there are three other employees at the elevator; and that any of the employees, not otherwise busy, wait on trade. The elevator is organized as a co-operative association. This witness further testified that prior to the occasion of the plaintiff losing his foot, this witness had never been in the grain pit. He entered the pit after the accident. and described the pit as a long, narrow passageway with an auger in the bottom of it and doors on each side of it which open to different grain bins. These are sliding doors, perhaps 3 or 4 feet above the floor.

On cross-examination this witness testified that before the plaintiff went to work at the elevator the matter was discussed by the board, and this witness was present at the time. The board discussed the matter because extra help was needed and the plaintiff was looking for work. The plaintiff made application for work, and the application was approved by the board. This witness further testified that the defendant is not a stockholder of the corporation; that the auger is located in the annex which is built on the east end of the elevator; that the annex is 25 or 30 feet long; that the auger is run by electricity which is turned on and off in the main part of the elevator; and that the auger and the grate covering it are visible when a person goes into that part of the annex.

The plaintiff testified that at the time of the trial he was 19 years old; that he obtained summer employ-

ment with the corporation and started to work the fore part of July at $1.25 an hour; that this was his first experience working in a grain elevator; that the part of the elevator referred to as the annex is to the east, and contains grain bins; that at the bottom there is a hallway referred to as the pit into which all the grain bins have openings that terminate about 3 feet above the floor; and that running through this pit is an auger. He further testified that to load a railroad car a person would first turn on the auger, then go down and open one of the sliding doors, and let the grain fall into the auger. He would then go upstairs to watch a counter on the wall until the car was almost filled. There is a scale upstairs that measures out ten bushels, and each time there are ten bushels it trips a number so that the person can figure how many bushels are in the car. When there are about three dumps left, and the person wants to stop the process, it is necessary to go down to the pit and shut the grain bin door, go back up and let the auger and leg empty out, and then shut it off. When the door is shut the auger is still running, if not, the grain would pile on top of the auger and stop it or plug it up. This witness was watching the counter gauge toward the end of the process and saw it reach the shut-off point. He said that he would go down and shut the bin door. Kenneth Troyer, another employee, said he would pull the spout out of the car. This witness further testified that he went to the east side of the annex building, then north down some stairs, then west into the pit where he went down three steps and stepped over a grain chute; and that he entered the pit door, walked down the steps toward the door to close it, forgot to pick up some paper to stick in the bin door, and turned to the left to pick up the paper off the floor. He remembered his foot slipping and something pulling on it, and the next thing he knew he did not have a leg. The auger was running when he entered the pit. He believed his foot slipped on some

wheat. He hopped out of the pit and up the stairs. Kenneth Troyer came to take care of him. His foot slipped into the auger near the door he was closing. The auger was covered with a grate. He did not know where the opening was that his foot slipped into, and testified that after his foot slipped into the auger a portion of the cover came loose.

On cross-examination the plaintiff testified that he had been down in the pit several times before the accident occurred; that he was there at times when the auger was rolling; that he was familiar with the auger, its size, the manner in which it revolved, and the speed at which it revolved when it was running empty; that he knew about what speed the auger was going when it was pulling grain up into the higher elevations; that there were electric lights in the area which were on at the time of the accident; that he was wearing regular work shoes approximately 3 or 4 inches wide; that the defendant was not the only person who gave him instructions; and that one of the employees who did so was Wilton Stauffer who was the assistant manager of the elevator. The plaintiff further testified that he had helped load 10 cars of grain; that he did not know for sure how he got his foot caught in the auger, whether his foot slipped, or what happened; and that he was not paying any particular attention as to where he was stepping with reference to the location of the auger or the grate. The plaintiff further testified that the insurance carrier for the corporation paid all of his hospital bills and his workmen's compensation of $37 a week up to the time of the trial.

On redirect examination the plaintiff testified that it was dusty in the pit on the day the accident occurred. On recross-examination he testified that he was born and raised on a farm until he went to work at the elevator; that during the time he was on the farm he had experience with revolving farm machinery and had operated tractors, combines, and elevators and that some

of that machinery included augers; that there was dust in the pit, and he knew that the dust was there before he started into the pit; that he knew the auger was running; and that he did not shut the auger off before he went down into the pit to close the door.

The defendant, Arthur Aden, testified that he had lived in Milford for 18 years and had been in the employ of the corporation since that time; that during that time he had been the manager of the elevator; that he was in the office part of the building when the accident occurred; that he does the general managing of the elevator, and Wilton Stauffer is the assistant manager who takes care of most of the outside work at the elevator and around the feed shed; that he, Aden, has very little to do other than office work; and that he makes all the managerial decisions and makes a definite report to the board once each month. He described the loading process by stating that when the grain is loaded from the annex the first thing to do is to push a button to turn on the elevator leg which takes the grain up to the top where it is distributed into the cars, then to push another button to get the auger coming toward the leg, then to go down into the hallway or pit where the auger is located and turning and open one of the gates that lets the grain pour into the auger. The grain is carried west in the auger, dumped into the belt cups, taken to the top, and dropped in the scale which measures out ten bushels each time it trips itself. This scale is automatic, and there is a register down below on the work floor that tallies each time the scale dumps the grain. The plaintiff was doing that type of work at the time of the accident. This witness further testified that when they are three dumps of grain away from the amount that the person wants in the car, you have to start shutting the grain off before you get the total capacity of the car. If the plaintiff was watching the indicator and he wanted three or four more dumps in that car, he would know it was just about full, then

he would go down, shut the gate, and shut the grain off. This must be done while the auger is continuing to run because it has to be empty before it is stopped. When the job is completed there is a bushel or so of grain on the floor to be swept in. When the machinery is in operation, dust is generated in this room and the employees normally wear dust masks. This witness further testified that after the plaintiff was taken to the hospital this witness went down and looked at the scene. The auger had been shut off and the grate over the auger was in place. He did not observe any blood on the grate. There was no clothing or anything of that kind in the room or in the auger. The severed foot ended up in the automatic scale.

On cross-examination the defendant testified that he was strictly on a salary basis, and was not a stockholder of the corporation; that he was originally employed by the board; that the board employed the plaintiff; that he gave no instructions with reference to work to the plaintiff on the date of the accident; and that the plaintiff's directions with reference to the work were to come from the assistant manager.

Kenneth Troyer testified that he heard the plaintiff call, and saw him crawling up the steps. He laid the plaintiff down, told Aden to call the rescue squad, and took off his own shirt and applied a tourniquet. He stayed with the plaintiff until plaintiff was taken to the hospital. He checked to see if the grain was shut off, and the wheat was still dribbling a little out of the hole. He went down into the pit and noticed that the grate was pushed to the west farther than it usually was. He made this observation right on the west side of the first bearing, and the bin door was just on the east side of the bearing. At that time the grate was to the west at least 6 inches. No part of the grate was raised above the floor. There was an opening above the auger at least 6 inches wide which he had not observed before. On other occasions the width of the opening at that

point was approximately 3 or 4 inches. On cross-examination this witness testified that the steel bars that go across the grate are half an inch wide; and that he did not measure them, but they run the full length of the grate.

LeRoy Ficke testified that he was the chairman of the board; that the defendant actually took care of the entire business as the manager, had control of the employees, and made the decisions relating to the shipping and selling of grain; that all of the members of the board are farmers, are not engaged in the grain business, nor do they conduct the business of the corporation; that he was notified of the accident and went to the elevator immediately, and into the pit; that the auger was shut off; that one of the bars in the grate was bent; that there was a boxing every 10 feet on the auger; and that this bent bar was about a foot or less from the boxing or bearing.

At the conclusion of the plaintiff's evidence the defendant made a motion for directed verdict. The trial court sustained the defendant's motion for directed verdict, and stated that he determined that a question of fact was not involved where the facts are not in dispute; that the evidence delineated the duties of each of the people who were working at the plant; that he concluded that the court was to construe the statute; and that he reached the conclusion that the term "operator" means the one who runs the business, that is, in this case, the corporation. The trial court entered judgment on behalf of the defendant.

The plaintiff contends that the trial court erred in ruling as a matter of law that the defendant Arthur Aden was not the operator of a plant under section 48-409, R. R. S. 1943; and that the trial court erred in failing to submit to the jury under appropriate instructions the issue of whether or not Arthur Aden was the operator of a plant under section 48-409, R. R. S. 1943.

Section 48-409, R. R. S. 1943, provides: "Every per-

son operating a plant where machinery is used, shall provide such guards, boxing, screens or other appliances as will protect employees against injury from belting, shafting, gearing, elevators, drums, saws, cogs, electric currents, molten metal or hot liquid. He shall also furnish and supply belt shifters which can be operated from the floor. All exposed cogs or gears shall be enclosed in metal casings or woven wire screens. Protruding set screws in collars and couplings or shafting or other revolving machinery shall be countersunk or covered with metal boxing. Pulleys, belts and projections of or from ends of shafting shall be protected by boxing or enclosing with metal or with other suitable material. Belts shall not rest on shafting in motion, but rest hooks shall be provided to hold belting free therefrom. Roll guards shall be placed on roll feed machines fed by hand at the point where the material is fed, and a device for instantly stopping the machine by the hand or foot shall also be provided within reach of the operator when operating the machine."

The plaintiff cites the case of Quist v. Duda, 159 Neb. 393, 67 N. W. 2d 481. This was an action in which the plaintiff, an employee of a tenant, sought to recover from the landlord damages in tort for injuries received in a man-lift in a garage, contending that the landlord violated the safety code of this state. The landlord defendants moved for directed verdict which was sustained. This court said: "The word operator generally relates to the person actively and directly engaged in an operation. Deep Vein Coal Co. v. Rainey, 62 Ind. App. 608, 112 N. E. 392; Flynn v. Pan American Hotel Co. (Tex. Civ. App.), 179 S. W. 2d 849, and same case 143 Tex. 219, 183 S. W. 2d 446." The last two cited cases interpreted the definition in the same manner as Quist v. Duda, *supra*.

The plaintiff asserts that every person operating a plant where machinery is used in violation of section 48-409, R. R. S. 1943, should be liable in damages to

any person injured, as provided by section 48-422, R.
R. S. 1943, which provides in part: "Every person op-
erating a plant where machinery is used who shall vio-
late any of the provisions of sections 48-401 to 48-424
shall be liable in damages to any person injured, as a
result thereof, * * *." The applicability of this act is
related to operation. Quist v. Duda, *supra.*

The plaintiff also cites the case of Baer v. Schaap, 168
Neb. 578, 97 N. W. 2d 207, wherein the court was deal-
ing specifically with section 48-425, R. R. S. 1943,
which had to do with scaffolds or staging, safety rails,
hoists, cranes, stays, ladders, supports, or other mechan-
ical contrivances used in the erection, repairing, alter-
ation, removal, or painting of any house, building, bridge,
viaduct or other structure. This court held that where
a scaffold was supplied on bailment, bailor was liable
if the scaffold did not meet requirements of the statute.
A rehearing was granted in the above-cited case. In
Baer v. Schaap, 171 Neb. 347, 106 N. W. 2d 468, this
court held the former opinion to be in error in holding
that the evidence was sufficient to submit the case to
the jury, and the decision in the former case was set
aside. In Baer v. Schaap, 172 Neb. 414, 109 N. W. 2d
724, a reargument was ordered by this court with ref-
erence to the opinion in Baer v. Schaap, 171 Neb. 347,
106 N. W. 2d 468. During the pendency of time for
reargument, the parties filed a stipulation in this court
for dismissal of the action, which was allowed, and the
appeal was dismissed. In any event, the above-cited
cases bear no relevancy to the instant case.

The plaintiff cites Waite v. State, 169 Neb. 113, 98
N. W. 2d 688, wherein this court said: "The word op-
erate as used in section 39-727, R. S. Supp., 1957, re-
lates to the actual physical handling of the controls of
the vehicle by a person while under the influence of in-
toxicating liquor." To like effect is Rose v. Gisi, 139
Neb. 593, 298 N. W. 333, which deals with a different

statute than the one being considered in the instant case and bears no relevancy to the instant case.

Other cases cited by the plaintiff do not meet the situation presented in the instant case under the facts adduced therein.

In considering section 48-409, R. R. S. 1943, which uses the words "operating a plant," this would include the corporation.

The term "every person" includes all persons, both natural and artificial. See § 49-801 (18), R. R. S. 1943.

In 35 Am. Jur., Master and Servant, § 193, p. 621, it is stated: "The purpose of statutes requiring that guards or other safety devices be provided for certain kinds of machinery used in industries is to remove all unnecessary danger to persons who are employed upon or about such machinery and are subject to dangers inherent in its operation, * * *."

In 35 Am. Jur., Master and Servant, § 360, p. 784, it is stated: "The obligation of the employer to furnish to his employee, for the performance of the work required of him, safe and suitable tools, machinery, and appliances such as a reasonable and prudent person would ordinarily use, and also to see that the same are kept in proper repair, * * *."

In 35 Am. Jur., Master and Servant, § 175, p. 604, it is stated: "The employer's obligation to care extends, as a general rule, to all tools, machinery, and appliances that may be furnished for the use of the employee in the discharge of his duties; and, for any neglect of this duty, the employee may hold the employer liable in damages." Several states adhere to this rule. See, Poos v. Fred Krug Brewing Co., 101 Neb. 491, 163 N. W. 840, L. R. A. 1918D 515; Westlake v. Murphy, 85 Neb. 45, 122 N. W. 684, 19 Ann. Cas. 149.

In the instant case the corporation is the employer of the plaintiff. Arthur Aden, defendant, is the manager of the corporation. "Manager" is defined as: "A person chosen or appointed to manage, direct, or administer

the affairs of another person or of a corporation or company." Black's Law Dictionary (3d ed.), p. 1151.

The evidence in the instant case clearly discloses that the defendant was the manager of the corporation and not the employer of the plaintiff.

Our research discloses many types of statutes relating to safety codes and decisions of foreign jurisdictions. Because of the different types of statutes and the facts in each case relating thereto, these decisions are not helpful in a determination of this appeal.

This court has not passed on the precise question now presented.

This case does not present a question of fact. The facts are not in substantial dispute. The trial court was obligated to construe section 48-409, R. R. S. 1943, and determine the meaning of the word "operator" as used in such section of the statute. The trial court interpreted the word "operator" to mean the owner-operator of a business, which is the corporation, and not the defendant Aden, the manager of the corporation. We conclude that the trial court properly interpreted the statute as applied to the instant case.

We further conclude that the trial court did not err in sustaining the defendant Aden's motion for directed verdict.

We affirm the judgment of the trial court.

AFFIRMED.